ACCEPTED
06-15-00052-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
11/12/2015 3:01:46 PM
DEBBIE AUTREY
CLERK

No. 06-15-00052-CV
_____

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
11/12/2015 3:01:46 PM
DEBBIE AUTREY
Clerk

_____

**TAMI DONALD, JERRY MOORE,
and SUMMIT SPRING WATER CO., INC.**

**Appellants**

**v.**

**BRIAN RHONE, CHRIS RHONE,
BMR DISTRIBUTING, INC., and RHONE WATER CO., INC.**

**Appellees**

_____

**On Appeal from the 336th District Court of Fannin County, Texas
The Honorable Laurine J. Blake, Judge Presiding**
_____

**APPELLANTS' BRIEF**

_____

**Chad M. Ruback**
**State Bar No. 90001244**
**chad@appeal.pro**
**The Ruback Law Firm**
**8117 Preston Road**
**Suite 300**
**Dallas, Texas 75225**
**(214) 522-4243**
**(214) 522-2191 fax**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

| **Appellants** | **Appellees** |
|---|---|

Tami Donald      Brian Rhone
Jerry Moore      Chris Rhone
Summit Spring Water Co., Inc.      BMR Distributing, Inc.
     Rhone Water Co., Inc.

**Trial Counsel for Appellants**

**Trial/Appellate Counsel for Appellees**

Maryam Hosseiny Herrera
4236 W. Lovers Lane      Thomas F. Dunn
Dallas, Texas 75209      3901 W. Pioneer Parkway
     Arlington, Texas 76013

Preston J. Dugas III
3100 W. 7th Street
Suite 230
Fort Worth, Texas 76107

Gena A. Hamm
133 W. McDermott Drive
Suite 200
Allen, Texas 75013

K. Klint Rybicki
302 W. Main Street
Royce City, Texas 75189

Frederick C. Shelton
P.O. Box 1335
Greenville, Texas 75403

**Appellate Counsel for Appellants**

Chad M. Ruback
8117 Preston Road
Suite 300
Dallas, Texas 75225

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ISSUES ON APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    ARGUMENT RELATED TO ISSUE 1: The trial court erroneously granted a directed verdict disposing of all causes of action asserted by the Plaintiffs/Appellants. The trial court's directed verdict was at the beginning of trial and was based solely on claims made by the Defendants/Appellees' counsel—unsupported by any testimony or evidence—before the Plaintiffs/Appellants even had the opportunity to present their witnesses and evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    ARGUMENT RELATED TO ISSUE 2: The only counterclaim pleaded by the Defendants/Appellees was a statutory claim pursuant to chapter nine of the Texas Business and Commerce Code. That chapter is captioned "Uniform Commercial Code—Secured Transactions," and the chapter is applicable only to secured transactions. However, there is no evidence (or insufficient evidence) that the transaction at issue in this case was a "secured transaction." And the Defendants/Appellees even admitted that the transaction was not a secured transaction. Consequently, the trial court erred in awarding damages (and attorneys' fees stemming from those damages) to the Defendants/Appellees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARGUMENT RELATED TO ISSUE 3: The only basis for attorneys' fees pleaded by the Defendants/Appellees was Texas Business and Commerce Code section 9.625. Similarly, the trial court's judgment expressly awarded attorneys' fees pursuant to Texas Business and Commerce Code section 9.625. But section 9.625 does not provide for an award of attorneys' fees. Consequently, even if the trial court was correct in awarding damages to the Defendants/Appellees, the trial court nevertheless erred in awarding attorneys' fees to the Defendants/Appellees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

APPENDIX A:      Final Judgment [CR 531-533]

APPENDIX B:      Findings of Fact and Conclusions of Law [CR 538-544]

APPENDIX C:      Asset Purchase Agreement (the contract at issue in this case) [CR 34-37]

APPENDIX D:      TEX. BUS. & COM. CODE § 9.101

APPENDIX E:      TEX. BUS. & COM. CODE § 9.625

# INDEX OF AUTHORITIES

TEX. BUS. & COM. CODE § 9.101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

TEX. BUS. & COM. CODE § 9.625. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37

*Claxton v. Upper Lake Fork Water Control & Improvement Dist. No. 1*,
    246 S.W.3d 381 (Tex. App.—Texarkana 2008, pet. denied). . . . . . . . . . . . 28

*Drew v. Harrison County Hosp. Ass'n*,
    20 S.W.3d 244 (Tex. App.—Texarkana 2000, no pet.). . . . . . . . . . . . . . 28

*Fin & Feather Club v. Leander*,
    415 S.W.3d 548 (Tex. App.—Texarkana 2013, pet. denied). . . . . . . . . . . . 23

*First City Bank-Farmers Branch v. Guex*,
    677 S.W.2d 25 (Tex. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Granite Partners, L.P. v. Bear Stearns & Co., Inc.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Heritage Gulf Coast Props., Ltd. v. Sandalwood*,
    416 S.W.3d 642 (Tex. App.—Houston [14th Dist.] 2013, no pet.). . . . . . . 36

*In re Nalle Plastics Family Ltd. P'ship*,
    406 S.W.3d 168 (Tex. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*John v. Marshall Health Servs., Inc.*,
    91 S.W.3d 446 (Tex. App.—Texarkana 2002, pet. denied). . . . . . . . . . . . 23

*Nassar v. Hughes*,
    882 S.W.2d 36 (Tex. App.—Houston [1st Dist.] 1994, writ denied). . . . . . 24

*North Cent. Distribs., Inc. v. Minyard Food Stores, Inc.*,
    05-12-00418-CV, 2014 WL 223060
    (Tex. App.—Dallas Jan. 21, 2014, no pet.). . . . . . . . . . . . . . . . . . . . . . . 34

*Smith v. Deneve*,
    285 S.W.3d 904 (Tex. App.—Dallas 2009, no pet.). . . . . . . . . . . . . . . . . . 36

*State Office of Risk Mgmt. v. Martinez*,
    300 S.W.3d 9 (Tex. App.—San Antonio 2009, pet. denied). . . . . . . . . 23-24

*Stearns v. Martens*,
    14-13-00094-CV, 2015 WL 5092497
    (Tex. App.—Houston [14th Dist.] Aug. 27, 2015, no pet.). . . . . . . . . . . . 24

*Tana Oil & Gas Corp. v. McCall*,
    104 S.W.3d 80 (Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

## STATEMENT OF THE CASE

This was a bench trial of a business dispute. [CR 84-100, 531] The trial court granted a directed verdict disposing of all causes of action asserted by the Plaintiffs/Appellants at the beginning of trial (before the Plaintiffs/Appellants even had the opportunity to present their witnesses and evidence). [CR 538-539; RR vol. 8 pp. 28-29, 32-33] Pursuant to this directed verdict, the trial court signed a judgment that the Plaintiffs/Appellants take nothing. [CR 531-532] The trial court's judgment also provided that the Defendants/Appellees recover $1,000 in damages plus attorneys' fees (of up to $25,000) and costs. [CR 531-532]

The Plaintiffs/Appellants filed a motion for new trial. [CR 650] In their motion for new trial, the Plaintiffs/Appellants argued that the trial court erred in granting a directed verdict based solely on claims made by the Defendants/Appellees' counsel—unsupported by any testimony or evidence—before the Plaintiffs/Appellants even had the opportunity to present their witnesses and evidence. [CR 651]

## ISSUES ON APPEAL

ISSUE 1: The trial court erroneously granted a directed verdict disposing of all causes of action asserted by the Plaintiffs/Appellants. The trial court's directed verdict was at the beginning of trial and was based solely on claims made by the Defendants/Appellees' counsel—unsupported by any testimony or evidence—before the Plaintiffs/Appellants even had the opportunity to present their witnesses and evidence.

ISSUE 2: The only counterclaim pleaded by the Defendants/Appellees was a statutory claim pursuant to chapter nine of the Texas Business and Commerce Code. That chapter is captioned "Uniform Commercial Code—Secured Transactions," and the chapter is applicable only to secured transactions. However, there is no evidence (or insufficient evidence) that the transaction at issue in this case was a "secured transaction." And the Defendants/Appellees even admitted that the transaction was not a secured transaction. Consequently, the trial court erred in awarding damages (and attorneys' fees stemming from those damages) to the Defendants/Appellees.

ISSUE 3: The only basis for attorneys' fees pleaded by the Defendants/Appellees was Texas Business and Commerce Code section 9.625. Similarly, the trial court's judgment expressly awarded attorneys' fees pursuant to Texas Business and Commerce Code section 9.625. But section 9.625 does not provide for an award of attorneys' fees. Consequently, even if the trial court was correct in awarding damages to the Defendants/Appellees, the trial court nevertheless erred in awarding attorneys' fees to the Defendants/Appellees.

## STATEMENT OF FACTS

In 1999, with no customers and little money, Tami Donald and her brother Jerry Moore established a water bottling company they named Summit Spring Water Company. [CR 87, 133, 155, 162] Over the next eight years, through hard work and $300,000 in marketing expenses, Tami and Jerry were able to develop a water sales route of 240 long-term customers. [CR 155-156; RR vol. 2 p. 19] Tami and Jerry (or their representatives) made regular deliveries of three-gallon or five-gallon bottles of water to these customers. [RR vol. 2 pp. 13-14]

Additionally, Tami and Jerry (or their representatives) began bottling water for two brothers, Chris Rhone and Brian Rhone. [CR 155] Chris and Brian owned two businesses, called BMR Distributing and Rhone Water Company, through which they sold bottled water but did not bottle their own water. [CR 15, 138, 155-156, 163, 219] Eventually, on January 1, 2007, Tami and Jerry entered into an asset purchase

9

agreement whereby they sold water bottling assets to Chris and Brian. [CR 34, 156, 163; RR vol. 8 p. 37][1]

Pursuant to the terms of the asset purchase agreement, Chris and Brian were to pay Tami and Jerry $5,000 per month for 48 months until the purchase price of $240,000 was paid in full.[2] [CR 34] For the first five months—from January through May of 2007—Chris and Brian made their $5,000-per-month payment. [CR 88, 156,

---

[1] At a hearing prior to trial, Chris and Brian's attorney claimed that the signatures of Chris and Brian on the asset purchase agreement were forgeries. [RR vol. 2 pp. 9, 18] At this hearing prior to trial, Chris and Brian testified that the signatures on the asset purchase agreement was not theirs. [RR vol. 2 pp. 41, 45] However, possibly because the trial court judge granted a directed verdict before any witnesses had an opportunity to testify at trial, there was no evidence at trial that the signatures were forgeries. Moreover, in her findings of fact, the judge did not find that the signatures were forgeries. [CR 538-544] To the contrary, the judge's findings of fact indicated that the asset purchase agreement was in fact "entered into." [CR 539]

[2] The findings of fact indicate that the trial court judge believed that the asset purchase agreement provided that the payments were to be paid to Summit Spring (rather than to Tami and Jerry). Specifically, finding of fact number 12 states: "Pursuant to the Asset Purchase Agreement, Defendants were to pay Plaintiff Summit Spring Water Company, Inc. the sum of $240,000 at the rate of $5,000 per month until paid in full." [CR 539] However, the asset purchase agreement specifies that the payments were to be made to "Seller," and the asset purchase agreement defines "Seller" as Tami and Jerry. [CR 34] In fact, the asset purchase agreement doesn't even mention Summit Spring. [CR 34-37] Consequently, Tami and Jerry challenge finding of fact number 12 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact and because the opposite of this finding of fact is established as a matter of law.

163; RR vol. 2 p. 23] Chris and Brian did not make any payment in June of 2007. [CR 88; RR vol. 2 p. 23]

After the due dates of the June payment and the July payment had both passed, Tami wrote a letter to Chris and Brian advising that they were in default of their contractual obligations. [CR 88, 181] In response, Brian sent a letter (1) complaining about some of the assets which were purchased and (2) stating that funds would be deducted "from the payment schedule." [CR 157, 160] Brian's letter indicated that a $4,000 check would be sent, and Tami and Jerry received the $4,000 check around the same time. [CR 157, 160, 163; RR vol. 2 p. 23] This $4,000 check was apparently all that Chris and Brian planned to pay for the months of June and July combined, despite the fact that the asset purchase agreement required a payment of $5,000 per month (i.e., a total of $10,000 for June and July). [CR 34, 157, 160, 163]

For the next several months, Chris and Brian were late making their monthly payments which, pursuant to the asset purchase agreement, were due on the first of each month. [CR 34, 89, 157] Chris and Brian failed to make any payment whatsoever in the month of December. [CR 89, 157] Instead, Chris and Brian represented that they were going to try to take out a loan so that they could satisfy their monthly payment obligations. [CR 89, 157; RR vol. 2 pp. 23-24] Later, Chris

11

and Brian represented that they were unable to get a loan, but that they were trying to get an investor. [CR 89, 157; RR vol. 2 p. 24]

In March of 2008, a few months after missing their December of 2007 payment, Brian sent a letter offering to pay $1,944 per month for 36 months, for a total of $70,000. [CR 89, 187; RR vol. 2 p. 24] Of course, the $1,944 per month offered by Brian was substantially less than the $5,000 per month required by the asset purchase agreement, and the $70,000 total payment offered by Brian was substantially less than the total still owed under the asset purchase agreement. While the record is not clear as to exactly how much of the $240,000 purchase price had already been paid by Chris and Brian, Brian's March of 2008 letter indicates that the payments made totaled either $40,500 or $45,000. [CR 187][3] Regardless of whether the payments made total $40,500 or $45,000 (or $44,000, as asserted by Tami and Jerry), the payments made plus the $70,000 offered in Brian's letter is substantially less than the $240,000 required by the asset purchase agreement. [CR 34] Not

[3] Brian's letter states: "We made 9 payments of $4500 = $45,000." [CR 187] Of course, 9 times $4,500 equals $40,500 rather than $45,000. So, it is unclear whether Brian was claiming to have paid $40,500 or $45,000 toward the total $240,000 required by the asset purchase agreement. At a hearing prior to trial, Chris testified that $45,000 was the total amount which had been paid. [RR vol. 2 p. 54] The trial court judge's findings of fact indicated that $45,000 was the total amount which had been paid. [CR 540] Tami and Jerry contended that the total amount paid was $44,000. [CR 547, 558, 662, 691; RR vol. 10 Defendant's Exhibit B2]

surprisingly, Tami and Jerry turned down this offer. [CR 89, 157, 540; RR vol. 2 p. 28]

Chris and Brian have made not any payments since November of 2007. [CR 90, 158, 163] At a pre-trial hearing, Chris indicated that the reason that there were no more payments being made is because he and Brian weren't making any money. [RR vol. 2 p. 56] After approximately 11 months without receiving any payments, Tami and Jerry filed suit in October of 2008. [CR 24]

The judge granted Tami and Jerry's request for temporary restraining order, prohibiting Chris and Brian from transferring any of the assets at issue. [CR 46-48] Later, the judge granted Tami and Jerry's request for temporary injunction. [CR 104-106] In doing so, the judge expressly held that "it is probable that, upon a final trial on the merits, Plaintiffs [Tami and Jerry] will prevail in their suit against Defendants [Chris and Brian] on their claims against Defendants [Chris and Brian]." [CR 104] In light of this, it is especially curious that, at the beginning of trial—before Tami and Jerry even had the opportunity to present their witnesses and evidence—the judge granted a directed verdict disposing of all causes of action asserted by Tami and Jerry. [CR 538-539] It is also curious that the judge appeared to base this directed verdict solely on claims made by Chris and Brian's counsel, unsupported by any testimony or evidence. [RR vol. 8 pp. 24-29]

A. At the beginning of trial—before Tami and Jerry even had the opportunity to present their witnesses and evidence—the judge granted a directed verdict disposing of all causes of action asserted by Tami and Jerry.

The trial of this case began quite normally. The trial court judge swore-in five witnesses. [RR vol. 8 pp. 12-13] The Plaintiffs' attorney (the attorney for Tami and Jerry) gave an opening statement. [RR vol. 8 pp. 17-20] The Defendants' attorney (the attorney for Chris and Brian) gave an opening statement. [RR vol. 8 pp. 20-23] Then, before the first witness took the stand, by agreement of the parties, the trial court judge admitted the asset purchase agreement into evidence. [RR vol. 8 p. 23] Immediately afterwards, before the first witness took the stand, the Defendants' attorney (the attorney for Chris and Brian) orally moved to dismiss the case. [CR 538; RR vol. 8 pp. 24-25] Although Chris and Brian's attorney did not use the words "directed verdict" at the time, the trial court judge later characterized this as a motion for directed verdict.[4] [CR 538]

_____

[4] The trial court judge held: "Before Plaintiffs put on any witness testimony in support of their claims, Defendants moved the Court for a directed verdict that Plaintiffs take nothing by their lawsuit." [CR 538]

14

In this oral motion, Chris and Brian's attorney argued that, by forfeiting its corporate charter,[5] Summit Spring lost its right to prosecute a cause of action. [CR 538-539; RR vol. 8 p. 25][6] But Chris and Brian's attorney failed to mention that, regardless of whether Summit Spring had the right to prosecute a cause of action, Tami and Jerry were also plaintiffs in this case and were prosecuting this case based on damages they personally suffered (irrespective of any damages that might have been suffered by Summit Spring). [CR 84-102] And Tami and Jerry emphasized that the contract at issue (the asset purchase agreement) was with Tami and Jerry, not with Summit Spring. [CR 34; RR vol. 8 pp. 26, 31]

---

[5] While Summit Spring was organized as a corporation, [CR 574] the trial court judge's findings of fact indicate that the judge erroneously believed that this corporate organization was done by Tami and Jerry. Specifically, finding of fact number 7 states: "Plaintiffs Tami Donald and Jerry Moore organized Summit Springs Water Company, Inc. as a corporation." [CR 539] However, there was no testimony or other evidence offered at trial that this corporate organization was done by Tami and Jerry. In fact, Summit Spring's articles of incorporation list the sole incorporator as someone named Teresa Campbell. [CR 574, 579] Consequently, Tami and Jerry challenge finding of fact number 7 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact and because the opposite of this finding of fact is established as a matter of law.

[6] Chris and Brian's attorney argued: "The plaintiff here is Summit Spring Water Companies, Inc. It is a corporation whose charter has been forfeited under the Texas Tax Code and the Texas Business Organizations Code. It may not pursue or defend a cause of action in the State of Texas in court." [RR vol. 8 p. 25]

15

Chris and Brian's attorney claimed that the asset purchase "agreement says they're selling Summit Spring Water Company's assets." [RR vol. 8 p. 31] But, in reality, the asset purchase agreement says no such thing. [CR 34-37] The asset purchase agreement specifies that Tami and Jerry are the sellers, and the asset purchase agreement never even mentions Summit Spring. [CR 34-37][7]

Chris and Brian's attorney also claimed that the assets being "sold belong to Summit Spring Water Company" rather than to Tami and Jerry. [RR vol. 8 p. 25] No witness testified in support of this claim by Chris and Brian's attorney, and no

[7] The findings of fact indicate that the trial court judge believed that all of the Plaintiffs (Tami, Jerry, and Summit Spring) sold the assets at issue. Specifically, finding of fact number 11 states: "Pursuant to the Asset Purchase Agreement, Plaintiffs conveyed and sold to Defendants all of the material operating assets of Summit Spring Water Company, Inc.'s bottled water business." [CR 539] However, the asset purchase agreement expressly defined the "Seller" as Tami and Jerry. [CR 34] In fact, the asset purchase agreement doesn't even mention Summit Spring. [CR 34-37] Consequently, Tami and Jerry challenge finding of fact number 11 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support Summit Spring having sold anything under the asset purchase agreement and because the opposite of this is established as a matter of law.

Similarly, conclusion of law number 3 refers to "the corporation's [Summit Spring's] rights under the Asset Purchase Agreement." [CR 542] And conclusion of law number 6 refers to "Summit Spring Water Company's right under the Asset Purchase Agreement." [CR 543] However, the asset purchase agreement doesn't even mention Summit Spring. [CR 34-37] Consequently, Tami and Jerry challenge conclusions of law number 3 and number 6 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support Summit Spring having any rights under the asset purchase agreement and because the opposite of this is established as a matter of law.

16

evidence was offered in support of this claim by Chris and Brian's attorney. Tami and Jerry's attorney responded (1) that the assets at issue have belonged to Tami and Jerry (not Summit Spring) since 2006 and (2) that the 2007 asset purchase agreement specified that the sellers of the assets were Tami and Jerry (not Summit Spring). [RR vol. 8 p. 26] Further, Tami and Jerry's attorney stated that witness testimony would establish that, prior to the time that the 2007 asset purchase agreement was signed, the assets at issue belonged to Tami and Jerry. [RR vol. 8 p. 28] However, rather than allowing Tami and Jerry to testify as to their ownership of the assets, the trial court judge said that she would be granting the relief sought by Chris and Brian's lawyer. [RR vol. 8 pp. 28-29] Although the trial court judge did not use the words "directed verdict" or "directed judgment" at the time, she later characterized this a "directed judgment."[8] [CR 539]

The trial court judge indicated that their case was over (before it even began) but that Tami and Jerry would be allowed to put on evidence solely for the purpose of making a record for appeal. [RR vol. 8 pp. 28-29, 32-33] The judge stated that this would be "[l]ike a bill of review." [RR vol. 8 p. 33] In this "bill of review," Tami testified that Summit Spring had previously owned the assets at issue but that

---

[8] The trial court judge stated: "The Court ultimately granted the Defendants' motion for directed judgment." [CR 539]

17

those assets were transferred to Tami and Jerry in July of 2006, well before the 2007

sale of the assets to Chris and Brian. [RR vol. 8 p. 35][9]

Tami and Jerry filed a motion for new trial. [CR 650] In their motion for new

trial, Tami and Jerry argued that the trial court erred in granting a directed verdict

based solely on claims made by Chris and Brian's counsel—unsupported by any

testimony or evidence—before Tami and Jerry even had the opportunity to present

---

[9] The findings of fact indicate that the trial court judge believed that Tami and Jerry testified that they liquidated Summit Spring and transferred all of its assets to themselves. Specifically, finding of fact number 16 states: "Plaintiffs Tami Donald and Jerry Moore testified and alleged that sometime before January 1, 2007, they liquidated Summit Spring Water Company, Inc. and transferred all of its assets and business to them." [CR 540] There are three inaccuracies in this statement. First, neither Tami nor Jerry testified that they liquidated anything. Second, while Tami testified in the "bill of review" that some Summit Spring assets were transferred to her and Jerry, [RR vol. 8 p. 35] neither Tami nor Jerry testified that all of Summit Spring's assets were transferred to them. Third, while Tami testified in the "bill of review" that some Summit Spring assets were transferred to her and Jerry, [RR vol. 8 p. 35] neither Tami nor Jerry testified that this transfer was made by her. To the contrary, Tami testified in the "bill of review" that the transfer was made by Jerry and Janet, [RR vol. 8 p. 35] Janet being Jerry's wife. [CR 545, 553] Consequently, Tami and Jerry challenge finding of fact number 16 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact.

As an aside, the trial court was also mistaken in stating in finding of fact number 8 that Tami and Jerry were the only directors of Summit Spring. [CR 539] Summit Spring's articles of incorporation show that Janet was a director of Summit Spring. [CR 574, 579] Summit Spring's franchise tax reports also show that Janet was a director of Summit Spring. [CR 581] Consequently, Tami and Jerry challenge finding of fact number 8 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact.

18

their witnesses and evidence. [CR 651, 658] Further, Tami and Jerry argued that (1) the asset purchase agreement specifies that Tami and Jerry are the sellers and (2) the asset purchase agreement never even mentions Summit Spring. [CR 658]

B.      After granting a directed verdict disposing of all causes of action asserted by Tami and Jerry, the judge proceeded to conduct a trial on Chris and Brian's counterclaim.

After granting a directed verdict disposing of all causes of action asserted by Tami and Jerry, the judge proceeded to conduct a trial on Chris and Brian's counterclaim. [RR vol. 8 pp. 28-29, 33, 35-36] The only counterclaim that Chris and Brian pleaded was a statutory claim for damages pursuant to Texas Business and Commerce Code section 9.625. [CR 372-373] Specifically, Chris and Brian pleaded entitlement to damages pursuant to section 9.625(b), (d) for "failure to comply with the provisions of Texas Business & Commerce Code Sections 9.610, 9.611, 9.613, 9.616, 9.625, 9.626 et. seq." and pleaded entitlement to "liquidated damages under Texas Business & Commerce Code § 9.625(e)." [CR 372-373]

Chris and Brian pleaded that these alleged failures to comply with the Texas Business & Commerce Code were related to Tami and Jerry "taking possession of, collecting and disposing of the assets/collateral sold to and repossessed from Counter-Claimants [Chris and Brian] under the APA [asset purchase agreement]."

[CR 372][10] Although Chris and Brian's pleadings did not go into further detail, the trial court judge found that Tami and Jerry did not give Chris and Brian (1) "any written notice before disposition of collateral as required under Tex. Bus. & Commerce Code §§9.610 et. seq." or (2) "any written notice of explanation and calculation of deficiency as required under Tex. Bus. & Commerce Code §9.616." [CR 541] The judge awarded $1,000 in damages to Chris and Brian. [CR 532] The judge indicated that, pursuant to section 9.625(e), this $1,000 was for two violations of the statute at $500 per violation. [CR 543] In addition to the $1,000 in damages, the judge also awarded attorneys' fees (of up to $25,000) to Chris and Brian and expressly held that this award was pursuant to Texas Business & Commerce Code section 9.625(b). [CR 532] Interestingly, section 9.625(b) doesn't mention attorneys' fees. Nor does any other part of section 9.625.

---

[10] The trial court judge's finding of fact number 19 states: "The Asset Purchase Agreement provided that the repossessed assets were to be sold by the seller and the price received credited against any debt owed by Defendants under the Asset Purchase Agreement." [CR 541] There are two inaccuracies in this statement. First, the asset purchase agreement does not "provide[] that the repossessed assets were to be sold by the seller." The asset purchase agreement simply does not include any provision requiring repossessed assets to be sold. [CR 34-37] Second, the asset purchase agreement does not include a provision requiring the "price received [to be] credited against any debt owed." [CR 34-37] Consequently, Tami and Jerry challenge finding of fact number 19 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact.

20

## SUMMARY OF THE ARGUMENT

The trial court erroneously granted a directed verdict disposing of all causes of action asserted by the Plaintiffs/Appellants. The trial court's directed verdict was at the beginning of trial and was based solely on claims made by the Defendants/Appellees' counsel—unsupported by any testimony or evidence—before the Plaintiffs/Appellants even had the opportunity to present their witnesses and evidence.

The only counterclaim pleaded by the Defendants/Appellees was a statutory claim pursuant to chapter nine of the Texas Business and Commerce Code. That chapter is captioned "Uniform Commercial Code—Secured Transactions," and the chapter is applicable only to secured transactions. However, there is no evidence (or insufficient evidence) that the transaction at issue in this case was a "secured transaction." And the Defendants/Appellees even admitted that the transaction was not a secured transaction. Consequently, the trial court erred in awarding damages (and attorneys' fees stemming from those damages) to the Defendants/Appellees.

The only basis for attorneys' fees pleaded by the Defendants/Appellees was Texas Business and Commerce Code section 9.625. Similarly, the trial court's judgment expressly awarded attorneys' fees pursuant to Texas Business and Commerce Code section 9.625. But section 9.625 does not provide for an award of

attorneys' fees.  Consequently, even if the trial court was correct in awarding damages to the Defendants/Appellees, the trial court nevertheless erred in awarding attorneys' fees to the Defendants/Appellees.

## ARGUMENT

**I.**      **ARGUMENT RELATED TO ISSUE 1: The trial court erroneously granted a directed verdict disposing of all causes of action asserted by the Plaintiffs/Appellants. The trial court's directed verdict was at the beginning of trial and was based solely on claims made by the Defendants/Appellees' counsel—unsupported by any testimony or evidence—before the Plaintiffs/Appellants even had the opportunity to present their witnesses and evidence.**

The trial court granted a directed verdict disposing of all causes of action asserted by Tami and Jerry. The trial court's directed verdict was at the beginning of trial and was based solely on claims made by Chris and Brian's counsel—unsupported by any testimony or evidence—before Tami and Jerry even had the opportunity to present their witnesses and evidence.

"A trial court's directed verdict is reviewed de novo." *Fin & Feather Club v. Leander*, 415 S.W.3d 548, 551 (Tex. App.—Texarkana 2013, pet. denied); *see John v. Marshall Health Servs., Inc.*, 91 S.W.3d 446, 450 (Tex. App.—Texarkana 2002, pet. denied) ("We review a trial court's directed verdict de novo.").

The Texas Supreme Court has held that "a directed verdict should not be granted against a party before the party has had a full opportunity to present its case and has rested." *Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 82 (Tex. 2003); *see State Office of Risk Mgmt. v. Martinez*, 300 S.W.3d 9, 11 (Tex. App.—San Antonio 2009, pet. denied). The Supreme Court has recognized an exception to this

23

rule when, in their pleadings, the parties have "affirmatively limited their claim to damages they could not recover as a matter of law." *Tana*, 104 S.W.3d at 82. That exception is not applicable to Tami and Jerry's claims, as Tami and Jerry's pleadings did not affirmatively limit their claim. [CR 84-103][11]

Unless such an exception applies, it is "reversible error for the trial court to direct a verdict without allowing the plaintiff to present all of its evidence." *Martinez*, 300 S.W.3d at 11-12; *see Stearns v. Martens*, 14-13-00094-CV, 2015 WL 5092497, at *2 (Tex. App.—Houston [14th Dist.] Aug. 27, 2015, no pet.) ("If a trial court renders a directed verdict against a party before that party has rested its case-in-chief, the trial court's directed verdict is reversible error absent application of the exception recognized by the Supreme Court of Texas."); *Nassar v. Hughes*, 882 S.W.2d 36, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("if done before the plaintiff has presented all his evidence, it is reversible error").

In light of the law being so clear, what possible explanation could there be for the trial court judge having granted a directed verdict without first allowing Tami and

---

[11] A review of Tami and Jerry's pleadings do not reflect any language affirmatively limiting their claim. [CR 84-103] Chris and Brian never claimed (at the time they their sought their directed verdict or at any other time) that Tami and Jerry's pleadings affirmatively limited their claim. Moreover, the trial court judge never found (at the time she granted the directed verdict, in her findings of fact, in her judgment, or at any other time) that Tami and Jerry's pleadings affirmatively limited their claim.

Jerry to present their case-in-chief? At the trial itself, the trial court judge offered no explanation for disregarding Texas Supreme Court precedent that "a directed verdict should not be granted against a party before the party has had a full opportunity to present its case and has rested." *Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 82 (Tex. 2003). Oddly, in her findings of fact, the judge claimed that she did not actually grant the motion for directed verdict until after hearing "testimony from witness called by the Plaintiff to refute the fact that Summit Spring Water Company, Inc. was the true Plaintiff in this case." [CR 539] This claim is problematic for a number of reasons.

First, as to the trial court judge's claim that she did not grant the motion for directed verdict until after hearing testimony from a "witness called by the Plaintiff," [CR 539] the trial court judge said on reporter's record pages 28 and 29 that she was granting the relief (sought by Chris and Brian's lawyer on pages 24 and 25), and she reiterated her decision on page 32. [RR vol. 8 pp. 24-25, 28-29, 32] However, Tami and Jerry did not call a witness until page 33. [RR vol. 8 p. 33] So, the reporter's record plainly shows that the trial court judge granted the directed verdict before

25

Tami and Jerry called their first witness . . . despite the trial court judge indicating otherwise in her findings of fact.[12]

Second, even when Tami and Jerry did call a witness on page 33, that was only after the judge indicated to Tami and Jerry on pages 32 and 33 that they may only call witnesses for the limited purpose of creating an appellate record. [RR vol. 8 pp. 32-33] ("Like a bill of review.") And, because the judge only permitted Tami and Jerry to call witnesses for the limited purpose of creating an appellate record, the judge could not have been considering the testimony of any such witness.

Third, in what appears to be an attempt to justify the curious timing of her directed verdict against Tami and Jerry, the judge made a finding of fact (number 5) suggesting that Summit Spring was the only "true Plaintiff in this case." [CR 539] But Tami and Jerry undisputedly filed a petition in the case, so that would—by definition—make each of them a "Plaintiff in this case" unless and until their claims

---

[12] The trial court judge's finding of fact number 5 states: "Prior to granting the Defendants' motion for directed verdict, the Court . . . heard arguments of counsel and testimony from witness called by the Plaintiff to refute the fact that Summit Spring Water Company, Inc. was the true Plaintiff in this case." [CR 539] However, as explained above, the reporter's record plainly shows that the trial court judge granted the directed verdict before Tami and Jerry called their first witness. Consequently, Tami and Jerry challenge finding of fact number 5 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact and because the opposite of this finding of fact is established as a matter of law.

were disposed of (e.g., by summary judgment or by trial). [CR 84, 539] Tami and Jerry might not have been plaintiffs after the judge granted a directed verdict disposing of their claims, but Tami and Jerry were—by definition—plaintiffs up until the moment that the judge granted a directed verdict against them.

Fourth, the asset purchase agreement specifies that the sellers were Tami and Jerry (and doesn't even mention Summit Spring). [CR 34-37][13] That alone would make Tami and Jerry appropriate plaintiffs. The fact that the asset purchase agreement specifies that the sellers were Tami and Jerry does not necessarily dictate that Tami and Jerry must win the case. But the fact that the asset purchase agreement

_____

[13] The findings of fact and conclusions of law indicate that the trial court judge believed (1) that the asset purchase agreement was entered into on behalf of Summit Spring and (2) that Summit Spring was the seller of the assets. Specifically, finding of fact number 10 states: "Plaintiffs Tami Donald and Jerry Moore, in their capacity as shareholders, directors and officers of Summit Spring Water Company, Inc. entered into the Asset Purchase Agreement on behalf of Summit Spring Water Company, Inc. as the seller therein." [CR 539] Similarly, conclusion of law number 1 states: "Plaintiff Summit Spring Water Company, Inc. is the true seller and party in interest under the Asset Purchase Agreement." [CR 542] However, the asset purchase agreement plainly specifies that (1) it was entered into by Tami and Jerry in their individual capacities and (2) that the sellers were Tami and Jerry in their individual capacities. [CR 34] ("Tami Donald and Jerry Moore, as individuals") In fact, the asset purchase agreement doesn't even mention Summit Spring. [CR 34-37] Furthermore, there was no testimony at trial (1) that the asset purchase agreement was entered into on behalf of Summit Spring or (2) that Summit Spring was the seller of the assets. Consequently, Tami and Jerry challenge finding of fact number 10 and conclusion of law number 1 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact and this conclusion of law.

specifies that the sellers were Tami and Jerry would—at the very least—constitute "some evidence" that they (rather than Summit Spring) were the sellers. That would be sufficient to defeat any pretrial dispositive motion (such as a motion for summary judgment)[14] and would entitle Tami and Jerry to put on their case-in-chief as to whether or not they (rather than Summit Spring) were the sellers.[15]

---

[14] In the context of a traditional motion for summary judgment, the asset purchase agreement specifying that the sellers were Tami and Jerry would—at the very least—create a fact issue as to whether Tami and Jerry were the sellers. And that would preclude the granting of traditional summary judgment. *See Claxton v. Upper Lake Fork Water Control & Improvement Dist. No. 1*, 246 S.W.3d 381, 383 (Tex. App.—Texarkana 2008, pet. denied) ("We reverse the summary judgment and remand this case to the trial court . . . because fact issues preclude summary judgment.").

In the context of a no-evidence motion for summary judgment, the asset purchase agreement specifying that the sellers were Tami and Jerry would—at the very least—constitute more than a scintilla of evidence that Tami and Jerry were the sellers. And that would preclude the granting of no-evidence summary judgment. *See Drew v. Harrison County Hosp. Ass'n*, 20 S.W.3d 244, 247 (Tex. App.—Texarkana 2000, no pet.) ("A no-evidence summary judgment is improperly granted if the nonmovant presents more than a scintilla of probative evidence to raise a genuine issue of material fact.").

[15] In his bankruptcy court case, Brian filed a motion to dismiss Tami and Jerry's claims for lack of standing based on Brian's allegations that Summit Spring was the only proper party to bring any claims related to the asset purchase agreement. [CR 587, 589-590] In 2010, the bankruptcy court judge denied Brian's motion to dismiss Tami and Jerry's claims. [CR 599-600] Curiously, nearly five years later, the trial court judge in this case appeared to adopt the very same reasoning rejected by the bankruptcy court judge.

Fifth, in the "bill of review," Tami testified that Summit Spring had previously owned the assets at issue but that those assets were transferred to Tami and Jerry in July of 2006, well before the 2007 sale of the assets to Chris and Brian. [RR vol. 8 p. 35] If the trial court judge had denied Chris and Brian's motion for directed verdict and allowed Tami to testify at trial—rather than merely make a record for appeal in a "bill of review"—the judge as fact finder could have found that Tami was lying.[16] In that case, the judge could arguably have (1) held that Tami and Jerry did not own the assets they purported to sell under the asset purchase agreement, (2) consequently

[16] The findings of fact indicate that the trial court judge did consider the testimony about the assets having been transferred to Tami and Jerry prior to the 2007 asset purchase agreement, but that the judge found that this testimony was not credible. Specifically, finding of fact number 16 states: "Plaintiffs Tami Donald and Jerry Moore testified and alleged that sometime before January 1, 2007, they liquidated Summit Spring Water Company, Inc., and transferred all of its assets and business to them. . . . The Court finds this testimony and alleged state of facts to be incredible." [CR 540]

However, as explained above, the reporter's record plainly shows that the trial court judge granted the directed verdict before there was any witness testimony. Specifically, the trial court ruled against Tami and Jerry on reporter's record pages 28 and 29 (and reiterated her decision on page 32) . . . but the first witness was not called until page 33. [RR vol. 8 pp. 28-29, 32-33] And the only testimony in the record about the transfer of assets to Tami and Jerry was during the "bill of review" (in which the judge permitted Tami and Jerry to call witnesses for the limited purpose of creating an appellate record). [RR vol. 8 pp. 32-33, 35] Because the testimony on this topic was during the "bill of review," the judge could not have been considering the testimony of any such witness. Consequently, Tami and Jerry challenge finding of fact number 16 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact.

held that Tami and Jerry could not have been damaged by any breach of contract by Chris and Brian, and (3) therefore rendered a take-nothing judgment following a full trial on the merits. But the judge simply did not do that. Instead, she chose to grant a directed verdict prior to allowing Tami and Jerry to present their case-in-chief. And, pursuant to Supreme Court case law, that constitutes reversible error.

Sixth, while the trial court judge attempted to justify her determination that Tami and Jerry did not own the assets that they purported to sell under the asset purchase agreement with alleged "judicial admissions" by Tami and Jerry in a their motion for partial summary judgment and affidavits attached thereto, [CR 540] this justification is faulty for several reasons:

A.  The trial court judge granted Tami and Jerry's motion to withdraw their motion for partial summary judgment, so the judge's reliance on the motion or any attachments thereto is questionable. [CR 239]

B.  In finding of fact 17(b), the judge indicated that the motion for partial summary judgment and the supporting affidavits constituted "judicial admissions" to support a "conclusion that it was Summit Spring Water Company, Inc. who was in fact the owner and seller of the bottled water business to Defendants under the Asset Purchase agreement." [CR

30

540][17] But the judge's findings of fact do not specify what language (or even what page) in the motion and affidavits constituted such "judicial admissions." [CR 540] And a review of the motion and the supporting affidavits does not reveal any language whatsoever which admits that Summit Spring owned the assets at the time of the 2007 asset purchase agreement. Moreover, nothing in the motion or the supporting affidavits is inconsistent with Tami's testimony (in the "bill of review") that Summit Spring transferred the assets to Tami and Jerry in 2006.

C.  In finding of fact 17(c), the judge found that Tami and Jerry's affidavits attached to the motion for partial summary judgment "were signed and submitted by them as President and Vice President of Summit Spring." [CR 540] Among many other pieces of background information, Tami's affidavit does state "I am the President of Summit Spring," and Jerry's affidavit does state "I am the Vice President of Summit Spring." [CR 154, 162] However, in their affidavits, Tami and Jerry never state that they are signing the affidavits in their capacity as officers of Summit

---

[17] Finding of fact number 17(b) states that the "bottled water business" itself was sold "under the Asset Purchase Agreement." [CR 540] However, the asset purchase agreement plainly indicates that the transaction was merely the sale of assets and not the sale of a "business." [CR 34] However, as explained elsewhere herein, this is not the only error in this finding of fact.

31

Spring. Moreover, even if Tami and Jerry had stated that they signed the affidavits in their capacity as officers of Summit Spring, that would still not constitute a "judicial admission" as to (1) whether Summit Spring transferred the assets to Tami and Jerry in 2006 or (2) whether the assets were owned by Summit Spring at the time of the 2007 asset purchase agreement.[18]

By granting a directed verdict disposing of all causes of action asserted by Tami and Jerry at the beginning of trial but before Tami and Jerry even had the opportunity to present their witnesses and evidence—in contravention of Texas Supreme Court case law—the judge reversibly erred in granting the directed verdict.

---

[18] Tami and Jerry challenge finding of fact number 17, including its subparts 17(b) and 17(c), because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this finding of fact.

**II. ARGUMENT RELATED TO ISSUE 2: The only counterclaim pleaded by the Defendants/Appellees was a statutory claim pursuant to chapter nine of the Texas Business and Commerce Code. That chapter is captioned "Uniform Commercial Code—Secured Transactions," and the chapter is applicable only to secured transactions. However, there is no evidence (or insufficient evidence) that the transaction at issue in this case was a "secured transaction." And the Defendants/Appellees even admitted that the transaction was not a secured transaction. Consequently, the trial court erred in awarding damages (and attorneys' fees stemming from those damages) to the Defendants/Appellees.**

The only counterclaim Chris and Brian pleaded was a statutory claim pursuant to chapter nine of the Texas Business and Commerce Code stemming from actions taken by Tami and Jerry related to the asset purchase agreement. [CR 372-373][19] Chapter nine is captioned "Uniform Commercial Code—Secured Transactions." TEX. BUS. & COM. CODE § 9.101 ("This chapter may be cited as Uniform Commercial Code—Secured Transactions."). As such, a statutory claim under chapter nine of the Texas Business and Commerce Code would only be applicable to "Secured Transactions." *See Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 17 F. Supp.

---

[19] Chris and Brian pleaded: "Counter-Claimants seek damages for lost surplus, attorney's fees and costs under Texas Business & Commerce Code §9.625(b), (d) arising by reason of Counter-Defendants failure to comply with the provisions of the Texas Business & Commerce Code Sections 9.610, 9.611, 9.613, 9.616, 9.625, 9.626 et. seq. in taking possession of, collecting and disposing of the assets/collateral sold to and repossessed from Counter-Claimants **under the APA** [Asset Purchase Agreement]." [CR 372] (emphasis supplied).

2d 275, 298 (S.D.N.Y. 1998) ("Uniform Commercial Code. . . . Article 9 is only applicable to secured transactions.").[20]

However, nothing in the asset purchase agreement states that it constitutes a "secured transaction" (or creates a security interest). Nor was there any evidence at trial that the parties even intended the asset purchase agreement to constitute a "secured transaction" (or intended the asset purchase agreement to create a security interest). There is simply no evidence (or insufficient evidence) that the transaction at issue in this case was a "secured transaction."[21] In fact, prior to trial, Chris and Brian repeatedly admitted that the asset purchase agreement does not create a security interest. [CR 63] ("nor does the APA create a legally recognized security interest

---

[20] "Article 9 of the Uniform Commercial Code" is synonymous with "chapter 9 of the Texas Business and Commerce Code." *See North Cent. Distribs., Inc. v. Minyard Food Stores, Inc.*, 05-12-00418-CV, 2014 WL 223060, at *3 n.4 (Tex. App.—Dallas Jan. 21, 2014, no pet.) ("Article 9 of the UCC has been adopted in Texas as chapter 9 of the business and commerce code.").

[21] Conclusion of law number 6 states that the asset purchase agreement created "a security interest in collateral and secured transaction governed by Article 9 of the Texas Uniform Commercial Code." [CR 543] Tami and Jerry challenge conclusion of law number 6 because there is no evidence, legally insufficient evidence, or factually insufficient evidence to support this conclusion of law. In fact, as noted above, Chris and Brian repeatedly admitted that the asset purchase agreement does not create a security interest. [CR 63] ("nor does the APA create a legally recognized security interest and lien in the assets under Article 9 of the Texas Uniform Commercial Code."); [RR vol. 2 p. 10] ("There's no security interest under the UCC."); [RR vol. 2 p. 59] ("There's no recognizable security interest.")

34

and lien in the assets under Article 9 of the Texas Uniform Commercial Code."); [RR vol. 2 p. 10] ("There's no security interest under the UCC."); [RR vol. 2 p. 59] ("There's no recognizable security interest.")

Because the only counterclaim Chris and Brian pleaded was a statutory claim applicable only to secured transactions—and there was no secured transaction in this case—the trial court reversibly erred in awarding damages (and attorneys' fees stemming from those damages) to Chris and Brian.

**III. ARGUMENT RELATED TO ISSUE 3: The only basis for attorneys' fees pleaded by the Defendants/Appellees was Texas Business and Commerce Code section 9.625. And the trial court's judgment expressly awarded attorneys' fees pursuant to that section. But that section does not provide for an award of attorneys' fees. Consequently, even if the trial court was correct in awarding damages to the Defendants/Appellees, the trial court nevertheless erred in awarding attorneys' fees to the Defendants/Appellees.**

Under Texas law, even if a party prevails in a lawsuit, the party is entitled to recover attorneys' fees only if attorneys' fees are expressly allowed by an applicable statutory provision or contractual provision. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 172 (Tex. 2013) ("Texas follows the American Rule, which provides that there can be no recovery of attorney's fees unless authorized by contract or statute."). The only contract at issue in this case is the asset purchase agreement, and it does not contain a provision which provides for recovery of attorneys' fees.

[CR 34-37] Moreover, Chris and Brian did not plead for attorneys' fees pursuant to any provision in the asset purchase agreement, [CR 368-374] and the trial court did not award attorneys' fees pursuant to any provision in the asset purchase agreement. [CR 531-532]

Chris and Brian pleaded for attorneys' fees only pursuant to Texas Business and Commerce Code section 9.625. [CR 372] Because Chris and Brian's pleading specified the basis on which they were seeking attorneys' fees (i.e., section 9.625), they cannot recover attorneys' fees pursuant to any other basis. *See Heritage Gulf Coast Props., Ltd. v. Sandalwood*, 416 S.W.3d 642, 660 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("when a party pleads a specific ground for recovery of attorney's fees, the party is limited to that ground and cannot recover attorney's fees on another, unpleaded ground."); *Smith v. Deneve*, 285 S.W.3d 904, 916 (Tex. App.—Dallas 2009, no pet.) (same). And Chris and Brian cannot recover attorneys' fees pursuant to the only ground on which they pleaded for attorneys' fees—section 9.625—because section 9.625 does not provide for recovery of attorneys' fees. TEX. BUS. & COM. CODE § 9.625.

Consistent with Chris and Brian's pleadings, the trial court's judgment expressly awarded attorneys' fees to them pursuant to Texas Business and Commerce Code section 9.625(b). [CR 532] But Chris and Brian cannot recover attorneys' fees

36

pursuant to section 9.625(b) because section 9.625(b) does not provide for recovery of attorneys' fees. TEX. BUS. & COM. CODE § 9.625(b).

Section 9.625(b) provides that "a person is liable for damages in the amount of any loss caused by a failure to comply with this chapter." TEX. BUS. & COM. CODE § 9.625(b). In the *Guex* case, the Texas Supreme Court considered a party's argument that this "any loss" language would justify an award of attorneys' fees.[22] *First City Bank-Farmers Branch v. Guex*, 677 S.W.2d 25, 30 (Tex. 1984). The Supreme Court rejected that argument, holding: "If the legislature had intended recovery of attorney's fees under this statue, they would no doubt have provided for it. . . . We have said . . . that an award of attorney's fees may not be supplied by implication but must be provided for by the express terms of the statute in question." *Id.*

Because the trial court expressly awarded attorneys' fees pursuant to statutory language that the Texas Supreme Court has expressly held cannot justify an award of attorneys' fees, the trial court erred in awarding attorneys' fees to Chris and Brian.

---

[22] The *Guex* case addressed this language in former Texas Business & Commerce Code section 9.507. *Guex*, 677 S.W.2d at 30. That section is now codified as section 9.625. *See* TEX. BUS. & COM. CODE § 9.625 cmt. 1 (specifying that the "Source" of section 9.625 is "Former Section 9-507").

## PRAYER

Appellants respectfully pray that this Court reverse the trial court's judgment

and remand for new trial. Appellants also pray for their costs and for all other relief

to which they may be entitled.

Respectfully submitted,

/s/ Chad M. Ruback
Chad M. Ruback
State Bar No. 90001244
chad@appeal.pro
The Ruback Law Firm
8117 Preston Road
Suite 300
Dallas, Texas 75225
(214) 522-4243
(214) 522-2191 fax

## CERTIFICATE OF COMPLIANCE

I certify that, according to my word processor's word-count function, in the sections of this brief covered by TRAP 9.4(i)(1), there are 7,719 words.

/s/ Chad M. Ruback
Chad M. Ruback

## CERTIFICATE OF SERVICE

I certify that, on November 12, 2015, I served a copy of this Appellants' Brief to the following counsel for Appellees:

Thomas F. Dunn
3901 W. Pioneer Parkway
Arlington, Texas 76013

/s/ Chad M. Ruback
Chad M. Ruback

## CAUSE NO. 38803

| | | |
|---|---|---|
| TAMI DONALD, JERRY MOORE and, | § | IN THE DISTRICT COURT |
| SUMMIT SPRING WATER COMPANY, | § | |
| INC., | § | |
| *Plaintiffs* | § | |
| | § | |
| vs. | § | FANNIN COUNTY, TEXAS |
| | § | |
| BRIAN RHONE, BMR DISTRIBUTING, | § | |
| INC., CHRIS RHONE, and RHONE | § | |
| WATER COMPANY, INC. d/b/a | § | |
| FROSTY'S WATER, | § | |
| *Defendants* | § | 336TH JUDICIAL DISTRICT |

### FINAL JUDGMENT

On May 4, 2015, above-entitled and numbered cause was heard and tried before the Court. Plaintiffs, Tammi Donald, Jerry Moore and Summit Spring Water Company, Inc., appeared in person and by and through their attorney of record, Frederick C. Shelton. Defendants, Brian Rhone, Chris Rhone, BMR Distributing, Inc. and Rhone Water Company, Inc. d/b/a Frosty's Water appeared in person and by and through their attorney of record, Thomas F. Dunn. The Plaintiffs and Defendants by and through their attorney of record each announced ready for trial and no jury having been demanded, all questions of fact were submitted to the Court.

After examining the pleadings, and hearing the evidence, testimony of witnesses and arguments of counsel, the Court finds and is of the opinion that this Court has jurisdiction over the parties and subject matter of this cause and that no other court has continuing jurisdiction over this cause; that venue of this cause of action is proper in this Court; that all questions of fact and law have been submitted to the Court; that all persons entitled to citation were properly cited; that the Plaintiffs should take nothing upon their claims by this suit; and that the Defendants upon their counter claim are entitled to recover from the Plaintiffs as set forth below in this judgment.

IT IS THEREFORE ORDERED by the Court that the Plaintiffs, Tammi Donald, Jerry Moore and Summit Spring Water Company, Inc., jointly and severally, take nothing by this suit.

IT IS FURTHER ORDERED by the Court that Defendants, Brian Rhone, Chris Rhone, BMR Distributing, Inc. and Rhone Water Company, Inc. d/b/a Frosty's Water, jointly and severally, have

FINAL JUDGMENT

PAGE -1-

531

and recover actual damages from and against Plaintiffs, Tammi Donald, Jerry Moore and Summit Spring Water Company, Inc., jointly and severally, the sum of $1,000.00.

IT IS FURTHER ORDERED by the Court that, pursuant to Texas Business & Commerce Code §9.625(b), Defendants, Brian Rhone, Chris Rhone, BMR Distributing, Inc. and Rhone Water Company, Inc. d/b/a Frosty's Water, jointly and severally, have and recover from and against Plaintiffs, Tammi Donald, Jerry Moore and Summit Spring Water Company, Inc., jointly and severally, attorney's fees in the sum of $15,000.00 for services rendered through the trial of this case. In the event of an appeal by Plaintiffs to the court of appeals, if the appeal is unsuccessful, Defendants will be further entitled to $5,000.00 as a reasonable attorney's fee; in the event of an appeal by Plaintiffs to the Supreme Court of Texas, if the appeal is unsuccessful, Defendants will be entitled to an additional $5,000.00 as a reasonable attorney's fee.

IT IS FURTHER ORDERED that the total amount of the judgment here rendered will bear interest at the rate of five percent (5.00%) per annum from May 4, 2015 until paid.

IT IS FURTHER ORDERED that:

All costs of court spent or incurred in this cause by Defendants are adjudged against Plaintiffs, Tammi Donald, Jerry Moore and Summit Spring Water Company, Inc., jointly and severally.

All writs and processes for the enforcement and collection of this judgment or the costs of court may issue as necessary.

This judgment finally disposes of all parties and claims and is appealable.

All relief requested in this case and not expressly granted is denied.

SIGNED on May ___8___, 2015.

_____
JUDGE PRESIDING

APPROVED AS TO FORM :

Thomas F. Dunn
SBN 06253300
Dunn Law Group, P.C.
3901 W. Pioneer Parkway
Arlington, Texas 76013
Telephone: (817) 459-0000
e-mail: tomdunn@dunnlawgroup.net
Attorneys for Defendants

Frederick C. Shelton
SBN 18211300
Law Office of Frederick C. Shelton
5701 Wesley
Greenville, TX 75402
Phone: (903) 454-1000
Email: fcs-attorney@sbcglobal.net
Attorneys for Plaintiffs

FINAL JUDGMENT                                    PAGE -3-

*filed*
*2:05 pm*

*5-22-15*

| | | |
|---|---|---|
| TAMI DONALD, JERRY MOORE and, | § | IN THE DISTRICT COURT |
| SUMMIT SPRING WATER COMPANY, | § | |
| INC., | § | |
| *Plaintiffs* | § | |
| | § | |
| vs. | § | FANNIN COUNTY, TEXAS |
| | § | |
| BRIAN RHONE, BMR DISTRIBUTING, | § | |
| INC., CHRIS RHONE, and RHONE | § | |
| WATER COMPANY, INC. d/b/a | § | |
| FROSTY'S WATER, | § | |
| *Defendants* | § | 336TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-captioned cause came on for trial before the Court without a jury on May 4, 2015. All parties and their attorneys were present. After considering the pleadings, the evidence, the argument and briefs from counsel, the Court, in response to a request from Plaintiffs, makes its findings of fact and conclusions of law as follows:

### FINDINGS OF FACT

The Court, upon the preponderance of the credible evidence and testimony adduced at trial, finds that:

1. After Plaintiff's counsel announced ready for trial, Plaintiff's counsel submitted the Asset Purchase Agreement into evidence.

2. Before Plaintiffs put on any witness testimony in support of their claims, Defendants moved the Court for a directed verdict that Plaintiffs take nothing by their lawsuit.

3. Defendants premised their motion on the certification by the Texas Secretary of State that on or about July 24, 2009, the Secretary of State of Texas, by reason of Summit Spring Water Company, Inc.'s failure to file franchise tax returns and public information reports as required by law, forfeited Plaintiff Summit Spring Water Company, Inc.'s charter and

authority to conduct business in the State of Texas.

4. As of the time of trial, Summit Spring Water Company, Inc.'s charter had not been reinstated.

5. Prior to granting the Defendants' motion for directed verdict, the Court (i) reviewed the Plaintiffs' Amended Original Petition, Defendants' Amended Original Answer And Counterclaim and the Plaintiffs' previously filed motion for partial summary judgment, and (ii) heard arguments of counsel and testimony from witness called by the Plaintiff to refute the fact that Summit Spring Water Company, Inc. was the true Plaintiff in this case. The Court's findings of fact on this issue are set forth below.

6. The Court ultimately granted the Defendants' motion for directed judgment.

7. On or about March 20, 2000, Plaintiffs Tami Donald and Jerry Moore organized Summit Springs Water Company, Inc. as a corporation under the laws of the State of Texas.

8. Plaintiffs Tami Donald and Jerry Moore constituted all of the shareholders, directors and officers of Summit Springs Water Company, Inc.

9. Over the years prior to 2007, Summit Spring Water Company, Inc. developed and grew a successful bottled water delivery business serving commercial and residential customers in and around Fannin County and the metropolitan DFW area.

10. On or about January 1, 2007, Plaintiffs Tami Donald and Jerry Moore, in their capacity as shareholders, directors and officers of Summit Spring Water Company, Inc., entered into the subject Asset Purchase Agreement on behalf of Summit Spring Water Company, Inc. as the seller therein, and Defendants as the purchasers therein.

11. Pursuant to the Asset Purchase Agreement, Plaintiffs conveyed and sold to Defendants all of the material operating assets of Summit Spring Water Company, Inc.'s bottled water business, including its customer list, bottles, racks, a fork lift, truck and good will.

12. Pursuant to the Asset Purchase Agreement, Defendants were to pay Plaintiff Summit Spring Water Company, Inc. the sum of $240,000.00 at the rate of $5,000.00 per month until paid in full.

13. During the late spring and into July 2007, Defendants advised Plaintiffs that they were unsatisfied with the condition of certain equipment assets purchased and that sales to

purchased customers were not generating the level of income that was represented.

14. Defendants requested a modification to the purchase price to be paid under the Asset Purchase Agreement which Plaintiffs rejected.

15. From January 1,2007 through November 2007, Defendants paid a total of $45,000.00 under the Asset Purchase Agreement.

16. Plaintiffs Tami Donald and Jerry Moore testified and alleged that sometime before January 1, 2007, they liquidated Summit Spring Water Company, Inc,. and transferred all of its assets and business to them, and that it was they, in their individual capacities, who were in fact the seller under the Asset Purchase Agreement. The Court finds this testimony and alleged state of facts to be incredible and unsubstantiated by any proffered evidence or documents such as a directors and/or shareholders resolution, plan of liquidation, bill of sale or tax returns.

17. The Plaintiffs' liquidation argument discussed in paragraph 16 above is contrary to Plaintiffs own judicial admissions, to wit:

    (a) On or about September 3, 2009, Plaintiffs filed their motion for partial summary judgment in this cause. This motion was later withdrawn by the Plaintiffs and was never ruled upon by the Court.

    (b) The facts alleged in the motion, and supported by the sworn affidavits of Tami Donald and Jerry Moore attached to the motion for partial summary judgment, clearly supports the Court's conclusions that it was Summit Spring Water Company, Inc. who was in fact the owner and seller of the bottled water business to Defendants under the Asset Purchase Agreement.

    (c) The supporting sworn to affidavits of Tami Donald and Jerry Moore were signed and submitted by them as President and Vice President of Summit Spring Water Company, Inc. Nowhere in the motion for partial summary judgment is it alleged that Summit Spring Water Company had liquidated and sold/assigned its assets and business to Tami Donald or Jerry Moore, individually, at any time prior to or after January 1, 2007.

FINDINGS OF FACT AND CONCLUSIONS OF LAW          PAGE -3-

(d)     Likewise, the Plaintiffs Amended Original Petition filed in this case doe$not ever allege any facts supporting their allegation and position that Summit Spring Water Company, Inc. had liquidated and sold/assigned its assets and business to Tami Donald or Jerry Moore, individually, at any time prior to or after January 1, 2007.

18.     The Asset Purchase Agreement granted the seller the right to repossess the assets soled under the Asset Purchase Agreement in the event of a default by Defendants thereunder.

19.     The Asset Purchase Agreement provided that the repossessed assets were to be sold by the seller and the price received credited against any debt owing by Defendants under the Asset Purchase Agreement.

20.     During August 2008 through October 2008, Plaintiffs did in fact repossess the sold assets still remaining in the hands of Defendants, including the customer list, bottles, racks, and bottles and racks at the residence/place of business of the customer's repossessed by Plaintiffs.

21.     All or substantially all of the repossessed assets were then sold by Plaintiffs to a Ms. Audrey Cooke of Aerobic Enterprises.

22.     Plaintiffs did not give Defendants any written notice before disposition of collateral as required under Tex. Bus. & Commerce Code §§9.610 et. seq..

23.      Plaintiffs did not give Defendants any written notice of explanation and calculation of deficiency as required under Tex. Bus. & Commerce Code §9.616.

24.     Plaintiffs offered insufficient evidence as to (i) the value of the assets they repossessed from the Defendants, and (ii) the commercial reasonableness of the price obtained and method of sale of the repossessed assets to Audrey Cook of Aerobic Enterprises.

25.     In their Amended Answer and Counterclaim filed in these proceedings, Defendants raised the affirmative defenses that Plaintiff Tami Donald and Jerry Moore were not proper parties to the lawsuit; that Plaintiffs claims for unpaid purchase price and other damages, including attorneys fees, under the Asset Purchase Agreement were barred under Tex. Bus. & Com. Code §9.626; and that Plaintiffs were liable to Defendants for damages, including attorneys

fees, under Tex. Bus. & Com. Code §9.625.

26. Defendants established that they had incurred reasonable and necessary attorneys fees in the defense of this case and prosecution of their own counterclaim in the amount of $30,000.00, and that in the event of an unsuccessful appeal by Plaintiffs to the Court of Appeals they would incur an additional $10,000.00 of legal fees, and that in the event of an unsuccessful appeal by Plaintiffs to the Supreme Court they would incur an additional $5,000.00 of legal fees.

27. Plaintiffs raised no objection to the amount, reasonableness or necessity of the attorneys fees proved up and requested by Defendants.

28. The Court reduced the amount of Defendants' attorneys fees to $15,000.00 through trial, and $5,000.00 in the event of an unsuccessful appeal by Plaintiffs to the Court of Appeals, and an additional $5,000.00 in the event of an unsuccessful appeal by Plaintiffs to the Supreme Court.

29. The above Findings of Fact are also to be deemed conclusions of law to the extent necessary to support the Court's judgment entered in this cause.

## CONCLUSIONS OF LAW

1. Plaintiff Summit Spring Water Company, Inc. is the true seller and party in interest under the Asset Purchase Agreement.

2. Plaintiffs Tami Donald and Jerry Moore are the shareholders, directors and officers of Summit Spring Water Company, Inc. As such, they are representatives and agents acting for and on behalf of Summit Spring Water Company, Inc.

3. Under the Texas Business Organizations Code and applicable Texas corporate common law, Tami Donald and Jerry Moore, as shareholders, directors and officers of Summit Spring Water Company, Inc. have no direct personal ownership interest in the assets and properties of the corporation (Summit Spring Water Company, Inc), including the corporation's rights under the Asset Purchase Agreement.

4. By reason of the Texas Secretary of State's forfeiture of Summit Spring Water Company's

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE -5-

charter and right to do business, Summit Spring Water Company, Inc. was not permitted to assert affirmative claims in a court of law nor defend claims or defenses against it. Tex. Tax Code §§171.252, 253.

5. The directors and officers of a corporation whose charter has been forfeited are personally liable for all debts of the corporation that accrue after the date of forfeiture and until the corporation's charter is revived. Tex. Tax Code §171.255.

6. Summit Spring Water Company's right under the Asset Purchase Agreement to reclaim and repossess the assets sold to Defendants constituted a security interest in collateral and secured transaction governed by Article 9 of the Texas Uniform Commercial Code.

7. Plaintiffs and Summit Spring Water Company's repossession from, and subsequent sale of the assets sold to, Defendants under the Asset Purchase Agreement constitutes a taking possession of, collecting and disposing of the assets/collateral governed by Sections 9.610, 9.611. 9.613, 9.616, 9.625, 9.626 et. seq. of the Texas Uniform Commercial Code.

8. Plaintiffs failed to comply with Tex. Bus. & Com. Code §9.610 et. seq..

9. Plaintiffs failed to comply with Tex. Bus. & Com. Code §9.616.

10. All of Plaintiffs claims under the Asset Purchase Agreement, including all of their attorneys fees and costs, are deemed satisfied and are unenforceable under Tex. Bus. & Com. Code §9.626(a)(3), (4).

11. Plaintiffs have failed to meet their burden of proof under Tex. Bus. & Com. Code §9.626(a)(1), (2).

12. Plaintiffs are liable to Defendants under Tex. Bus. & Com. Code §9.625(b) for their reasonable and necessary attorneys fees in the amount of $15,000.00 through trial, and $5,000.00 in the event of an unsuccessful appeal by Plaintiffs to the Court of Appeals, and an additional $5,000.00 in the event of an unsuccessful appeal by Plaintiffs to the Supreme Court.

13. Plaintiffs are liable for liquidated damages to Defendants in the amount of $1,000.00 ($500.00 per violation) under Tex. Bus. & Com. Code §§9.625(e).

14. Plaintiffs are liable to Defendants for costs of suit and post judgment interest at 5% per annum.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PAGE -6-

543

15.  The above Conclusions of Law are also to be deemed findings of fact to the extent necessary to support the Court's judgment entered in this cause.

SIGNED this 22 day of _____ May _____, 2015.


_____

JUDGE PRESIDING

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made this 1st day of January, 2007, by and between Tami Donald and Jerry Moore, as individuals hereafter referred to as Seller, and Brian Rhone of BMR Distributing and Chris Rhone as individuals herein referred to as Buyer.

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all Seller's rights, title and interest, if any, in and to certain assets on the terms described below.

NOW, THEREFORE, the parties agree as follows:

1. **Preamble; Preliminary Recitals.**

The preamble and preliminary recitals set forth above are by this reference incorporated in and made a part of this Agreement.

2. **Purchase of Assets.**

Subject to the provisions of this Agreement, Buyer agrees to purchase, and Seller agrees to sell, all Seller's rights, title and interest, if any, in and to the Purchased Assets, as defined in this paragraph. The purchase price for the Purchased Assets shall be $240,000 ("Purchase Price").

"Purchased Assets" include water sales route with approximately 240 customers, 2000 GMC water delivery truck, water bottling equipment, 2001 Chevrolet van, forklift, racks, bottles, and other miscellaneous inventory.

3. **Payment of Purchase Price.**

Buyer shall deliver to Seller $5,000 per month beginning on January 1, 2007 and payable on the 1st of every month until purchase price of $240,000 is paid in full. At the time of payoff, title to truck, van and equipment will be given to buyer. Payments shall be made to:

Tami Donald, 179 St Joseph Ave, Long Beach, CA 90803 unless otherwise notified by Seller.

4. **Assumption of Liabilities.**

At Closing Buyer shall assume and agree to perform as appropriate only the following liabilities and obligations (the "Assumed Liabilities"):

All obligations under bottled water customer purchase orders;

Except for the Assumed Liabilities, Buyer is not assuming, nor shall it in any way be liable or responsible for, any liabilities, obligations or debts of Seller, whether accrued, absolute, contingent or otherwise, arising before or after the Closing.

5. **Covenants of Seller.**

Seller hereby covenants and agrees with Buyer that:

a. Until the Closing Seller shall use its best efforts to maintain its current

34

relationships with suppliers, customers and others having business relations with Seller in connection with the Purchased Assets.

b.      Until the Closing, except as may be first approved in writing by Buyer or as is otherwise permitted or contemplated by this Agreement, Seller shall conduct its business and all transactions with respect to the Purchased Assets, only in the usual and ordinary course of business consistent with Seller's past practice.

c.      Until the Closing, Seller shall make no sale of assets other than in the ordinary course of Seller's past practice.

6.  **Closing.**

At the Closing, Seller shall deliver the Purchased Assets to Buyer and shall deliver the following documents to Buyer:

    i.      An Asset Purchase Agreement

    ii.     list of Accounts;

    ii.     list of Inventory;

    iii.    such other documents as may be reasonably requested by Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

b.      At Closing Buyer shall deliver to Seller the following documents:

    i.      executed counterparts of the Asset Purchase Agreement

    ii.     such other documents as may be reasonably requested by Seller in connection with the consummation of the transactions contemplated by this Agreement.

7.  **Delivery and Condition of the Purchased Assets.**

a.      Immediately upon completion of the Closing, Seller shall be deemed to have fully and completely transferred to Buyer all his rights, title and interest, if any, in, as well as possession, custody and control of, the Purchased Assets. Seller shall not be liable or responsible for any liabilities or obligations of any kind or nature whatsoever arising out of, under, or related to the Purchased Assets from and after the Closing.

b.      Buyer agrees that it is purchasing and shall take possession of the Purchased Assets in their AS IS, WHERE IS condition and acknowledges that it has previously been given the opportunity to and has conducted such investigations and inspections of the Purchased Assets as it has deemed necessary or appropriate for the purposes of this Agreement.

c.      EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, SELLER DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATIONS, STATEMENTS, WARRANTIES, OR CONDITIONS OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE PURCHASED ASSETS, INCLUDING (WITHOUT LIMITING THE GENERALITY OF THE FOREGOING) ANY WARRANTIES REGARDING THE

2

35

OWNERSHIP, CONDITION, QUANTITY AND/OR QUALITY OF ANY OR ALL OF THE PURCHASED ASSETS AND ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED.

8.    Conditions Precedent to Closing.

The performance by Seller and Buyer of their respective obligations under this Agreement is subject to the condition that on the Closing Date no suit, action or other proceeding shall be pending before any court or governmental or regulatory authority which seeks to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated by this Agreement.

9.    Default.

    a.    If Buyer fails to make the required payments as listed above or otherwise defaults under this Agreement, then Seller shall have the right to reclaim assets and be reimbursed for any monies owed.

10.    Indemnity.

Buyer shall indemnify, defend and hold Seller harmless from and against any and all losses, liabilities, damages, costs and obligations (or actions or claims in respect thereof) (including reasonable counsel fees), which Seller may suffer or incur arising out of or based upon:

    a.    the breach of any representation, warranty, covenant or agreement of Buyer contained in this Agreement;

    b.    the Assumed Liabilities; and

    c.    the operation of the Business and the use of any of the Purchased Assets after the Closing.

11.    Brokers.

Buyer and Seller each warrants to the other that it has not engaged, consented to, or authorized any broker, investment banker, or other third party to act on its behalf, directly or indirectly, as a broker or finder in connection with the transactions contemplated by this Agreement and no such third party is entitled to any fee or compensation in connection with this Agreement or the transactions contemplated hereby by reason of any action of it.

12.    Amendment and Modification.

This Agreement may be amended, modified or supplemented only by written agreement of Buyer and Seller.

13.    Severability.

Any provision of this Agreement that shall be prohibited or unenforceable shall be deemed ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

3

36

14. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

15. Counterparts.

This Agreement may be executed in one or more counterparts all of which when taken together constitute one and the same instruments. A signed counterpart is as binding as an original.

16. Headings, Exhibits.

The headings used in this Agreement are for convenience only and shall not be used to limit or construe the contents of any of the sections of this Agreement. All lettered Exhibits are attached to and by this reference made a part of this Agreement.

17. Binding Effect.

This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

SELLER:                                          BUYER:

Tami
Donald:                                          Brian Rhone

Jerry
Moore:                                           Chris Rhone

4

37

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
        Title 1. Uniform Commercial Code (Refs & Annos)
            Chapter 9. Secured Transactions (Refs & Annos)
                Subchapter A. Short Title, Definitions, and General Concepts

V.T.C.A., Bus. & C. § 9.101

§ 9.101. Short Title

Effective: July 1, 2001

Currentness

This chapter may be cited as Uniform Commercial Code--Secured Transactions.

**Credits**

Acts 1967, 60th Leg., p. 2343, ch. 785, § 1. Amended by Acts 1973, 63rd Leg., p. 999, ch. 400, § 5; Acts 1999, 76th Leg., ch. 414, § 1.01, eff. July 1, 2001.

**Editors' Notes**

**UNIFORM COMMERCIAL CODE COMMENT**

**2015 Electronic Update**

1. **Source.** This Article supersedes former Uniform Commercial Code (UCC) Article 9. As did its predecessor, it provides a comprehensive scheme for the regulation of security interests in personal property and fixtures. For the most part this Article follows the general approach and retains much of the terminology of former Article 9. In addition to describing many aspects of the operation and interpretation of this Article, these Comments explain the material changes that this Article makes to former Article 9. Former Article 9 superseded the wide variety of pre-UCC security devices. Unlike the Comments to former Article 9, however, these Comments dwell very little on the pre-UCC state of the law. For that reason, the Comments to former Article 9 will remain of substantial historical value and interest. They also will remain useful in understanding the background and general conceptual approach of this Article.

Citations to "Bankruptcy Code Section ____" in these Comments are to Title 11 of the United States Code as in effect on July 1, 2010.

2. **Background and History.** In 1990, the Permanent Editorial Board for the UCC with the support of its sponsors, The American Law Institute and the National Conference of Commissioners on Uniform State Laws, established a committee to study Article 9 of the UCC. The study committee issued its report as of December 1, 1992, recommending the creation of a drafting committee for the revision of Article 9 and also recommending numerous specific changes to Article 9. Organized in 1993, a drafting committee met fifteen times from 1993 to 1998. This Article was approved by its sponsors in 1998. This Article was conformed to revised Article 1 in 2001 and to amendments to Article 7 in 2003. The sponsors approved amendments to selected sections of this Article in 2010.

3. **Reorganization and Renumbering; Captions; Style.** This Article reflects a substantial reorganization of former Article 9 and renumbering of most sections. New Part 4 deals with several aspects of third-party rights and duties that are unrelated to

perfection and priority. Some of these were covered by Part 3 of former Article 9. Part 5 deals with filing (covered by former Part 4) and Part 6 deals with default and enforcement (covered by former Part 5). Appendix I contains conforming revisions to other articles of the UCC, and Appendix II contains model provisions for production-money priority.

This Article also includes headings for the subsections as an aid to readers. Unlike section captions, which are part of the UCC, see Section 1-107, subsection headings are not a part of the official text itself and have not been approved by the sponsors. Each jurisdiction in which this Article is introduced may consider whether to adopt the headings as a part of the statute and whether to adopt a provision clarifying the effect, if any, to be given to the headings. This Article also has been conformed to current style conventions.

4. **Summary of Revisions.** Following is a brief summary of some of the more significant revisions of Article 9 that are included in the 1998 revision of this Article.

a. **Scope of Article 9.** This Article expands the scope of Article 9 in several respects.

*Deposit accounts.* Section 9-109 includes within this Article's scope deposit accounts as original collateral, except in consumer transactions. Former Article 9 dealt with deposit accounts only as proceeds of other collateral.

*Sales of payment intangibles and promissory notes.* Section 9-109 also includes within the scope of this Article most sales of "payment intangibles" (defined in Section 9-102 as general intangibles under which an account debtor's principal obligation is monetary) and "promissory notes" (also defined in Section 9-102). Former Article 9 included sales of accounts and chattel paper, but not sales of payment intangibles or promissory notes. In its inclusion of sales of payment intangibles and promissory notes, this Article continues the drafting convention found in former Article 9; it provides that the sale of accounts, chattel paper, payment intangibles, or promissory notes creates a "security interest." The definition of "account" in Section 9-102 also has been expanded to include various rights to payment that were general intangibles under former Article 9.

*Health-care-insurance receivables.* Section 9-109 narrows Article 9's exclusion of transfers of interests in insurance policies by carving out of the exclusion "health-care-insurance receivables" (defined in Section 9-102). A health-care-insurance receivable is included within the definition of "account" in Section 9-102.

*Nonpossessory statutory agricultural liens.* Section 9-109 also brings nonpossessory statutory agricultural liens within the scope of Article 9.

*Consignments.* Section 9-109 provides that "true" consignments-bailments for the purpose of sale by the bailee-are security interests covered by Article 9, with certain exceptions. See Section 9-102 (defining "consignment"). Currently, many consignments are subject to Article 9's filing requirements by operation of former Section 2-326.

*Supporting obligations and property securing rights to payment.* This Article also addresses explicitly (i) obligations, such as guaranties and letters of credit, that support payment or performance of collateral such as accounts, chattel paper, and payment intangibles, and (ii) any property (including real property) that secures a right to payment or performance that is subject to an Article 9 security interest. See Sections 9-203, 9-308.

*Commercial tort claims.* Section 9-109 expands the scope of Article 9 to include the assignment of commercial tort claims by narrowing the exclusion of tort claims generally. However, this Article continues to exclude tort claims for bodily injury and other non-business tort claims of a natural person. See Section 9-102 (defining "commercial tort claim").

*Transfers by States and governmental units of States.* Section 9-109 narrows the exclusion of transfers by States and their governmental units. It excludes only transfers covered by another statute (other than a statute generally applicable to security interests) to the extent the statute governs the creation, perfection, priority, or enforcement of security interests.

*Nonassignable general intangibles, promissory notes, health-care-insurance receivables, and letter-of-credit rights.* This Article enables a security interest to attach to letter-of-credit rights, health-care-insurance receivables, promissory notes, and general intangibles, including contracts, permits, licenses, and franchises, notwithstanding a contractual or statutory prohibition against or limitation on assignment. This Article explicitly protects third parties against any adverse effect of the creation or attempted enforcement of the security interest. See Sections 9-408, 9-409.

Subject to Sections 9-408 and 9-409 and two other exceptions (Sections 9-406, concerning accounts, chattel paper, and payment intangibles, and 9-407, concerning interests in leased goods), Section 9-401 establishes a baseline rule that the inclusion of transactions and collateral within the scope of Article 9 has no effect on non-Article 9 law dealing with the alienability or inalienability of property. For example, if a commercial tort claim is nonassignable under other applicable law, the fact that a security interest in the claim is within the scope of Article 9 does not override the other applicable law's effective prohibition of assignment.

b. **Duties of Secured Party.** This Article provides for expanded duties of secured parties.

*Release of control.* Section 9-208 imposes upon a secured party having control of a deposit account, investment property, or a letter-of-credit right the duty to release control when there is no secured obligation and no commitment to give value. Section 9-209 contains analogous provisions when an account debtor has been notified to pay a secured party.

*Information.* Section 9-210 expands a secured party's duties to provide the debtor with information concerning collateral and the obligations that it secures.

*Default and enforcement.* Part 6 also includes some additional duties of secured parties in connection with default and enforcement. See, e.g., Section 9-616 (duty to explain calculation of deficiency or surplus in a consumer-goods transaction).

c. **Choice of Law.** The choice-of-law rules for the law governing perfection, the effect of perfection or nonperfection, and priority are found in Part 3, Subpart 1 (Sections 9-301 through 9-307). See also Section 9-316.

*Where to file: Location of debtor.* This Article changes the choice-of-law rule governing perfection (i.e., where to file) for most collateral to the law of the jurisdiction where the debtor is located. See Section 9-301. Under former Article 9, the jurisdiction of the debtor's location governed only perfection and priority of a security interest in accounts, general intangibles, mobile goods, and, for purposes of perfection by filing, chattel paper and investment property.

*Determining debtor's location.* As a baseline rule, Section 9-307 follows former Section 9-103, under which the location of the debtor is the debtor's place of business (or chief executive office, if the debtor has more than one place of business). Section 9-307 contains three major exceptions. First, a "registered organization," such as a corporation or limited liability company, is located in the State under whose law the debtor is organized, e.g., a corporate debtor's State of incorporation. Second, an individual debtor is located at his or her principal residence. Third, there are special rules for determining the location of the United States and registered organizations organized under the law of the United States.

*Location of non-U.S. debtors.* If, applying the foregoing rules, a debtor is located in a jurisdiction whose law does not require public notice as a condition of perfection of a nonpossessory security interest, the entity is deemed located in the District of Columbia. See Section 9-307. Thus, to the extent that this Article applies to non-U.S. debtors, perfection could be accomplished in many cases by a domestic filing.

*Priority.* For tangible collateral such as goods and instruments, Section 9-301 provides that the law applicable to priority and the effect of perfection or nonperfection will remain the law of the jurisdiction where the collateral is located, as under former

Section 9-103 (but without the confusing "last event" test). For intangible collateral, such as accounts, the applicable law for priority will be that of the jurisdiction in which the debtor is located.

*Possessory security interests; agricultural liens.* Perfection, the effect of perfection or nonperfection, and priority of a possessory security interest or an agricultural lien are governed by the law of the jurisdiction where the collateral subject to the security interest or lien is located. See Sections 9-301, 9-302.

*Goods covered by certificates of title; deposit accounts; letter-of-credit rights; investment property.* This Article includes several refinements to the treatment of choice-of-law matters for goods covered by certificates of title. See Section 9-303. It also provides special choice-of-law rules, similar to those for investment property under current Articles 8 and 9, for deposit accounts (Section 9-304), investment property (Section 9-305), and letter-of-credit rights (Section 9-306).

*Change in applicable law.* Section 9-316 addresses perfection following a change in applicable law.

d. **Perfection.** The rules governing perfection of security interests and agricultural liens are found in Part 3, Subpart 2 (Sections 9-308 through 9-316).

*Deposit accounts; letter-of-credit rights.* With certain exceptions, this Article provides that a security interest in a deposit account or a letter-of-credit right may be perfected *only* by the secured party's acquiring "control" of the deposit account or letter-of-credit right. See Sections 9-312, 9-314. Under Section 9-104, a secured party has "control" of a deposit account when, with the consent of the debtor, the secured party obtains the depositary bank's agreement to act on the secured party's instructions (including when the secured party becomes the account holder) or when the secured party is itself the depositary bank. The control requirements are patterned on Section 8-106, which specifies the requirements for control of investment property. Under Section 9-107, "control" of a letter-of-credit right occurs when the issuer or nominated person consents to an assignment of proceeds under Section 5-114.

*Electronic chattel paper.* Section 9-102 includes a new defined term: "electronic chattel paper." Electronic chattel paper is a record or records consisting of information stored in an electronic medium (i.e., it is not written). Perfection of a security interest in electronic chattel paper may be by control or filing. See Sections 9-105 (*sui generis* definition of control of electronic chattel paper), 9-312 (perfection by filing), 9-314 (perfection by control).

*Investment property.* The perfection requirements for "investment property" (defined in Section 9-102), including perfection by control under Section 9-106, remain substantially unchanged. However, a new provision in Section 9-314 is designed to ensure that a secured party retains control in "repledge" transactions that are typical in the securities markets.

*Instruments, agricultural liens, and commercial tort claims.* This Article expands the types of collateral in which a security interest may be perfected by filing to include instruments. See Section 9-312. Agricultural liens and security interests in commercial tort claims also are perfected by filing, under this Article. See Sections 9-308, 9-310.

*Sales of payment intangibles and promissory notes.* Although former Article 9 covered the outright sale of accounts and chattel paper, sales of most other types of receivables also are financing transactions to which Article 9 should apply. Accordingly, Section 9-102 expands the definition of "account" to include many types of receivables (including "health-care-insurance receivables," defined in Section 9-102) that former Article 9 classified as "general intangibles." It thereby subjects to Article 9's filing system sales of more types of receivables than did former Article 9. Certain sales of payment intangibles-primarily bank loan participation transactions-should not be subject to the Article 9 filing rules. These transactions fall in a residual category of collateral, "payment intangibles" (general intangibles under which the account debtor's principal obligation is monetary), the sale of which is exempt from the filing requirements of Article 9. See Sections 9-102, 9-109, 9-309 (perfection upon attachment). The perfection rules for sales of promissory notes are the same as those for sales of payment intangibles.

*Possessory security interests.* Several provisions of this Article address aspects of security interests involving a secured party or a third party who is in possession of the collateral. In particular, Section 9-313 resolves a number of uncertainties under former Section 9-305. It provides that a security interest in collateral in the possession of a third party is perfected when the third party acknowledges in an authenticated record that it holds for the secured party's benefit. Section 9-313 also provides that a third party need not so acknowledge and that its acknowledgment does not impose any duties on it, unless it otherwise agrees. A special rule in Section 9-313 provides that if a secured party already is in possession of collateral, its security interest remains perfected by possession if it delivers the collateral to a third party and the collateral is accompanied by instructions to hold it for the secured party or to redeliver it to the secured party. Section 9-313 also clarifies the limited circumstances under which a security interest in goods covered by a certificate of title may be perfected by the secured party's taking possession.

*Automatic perfection.* Section 9-309 lists various types of security interests as to which no public-notice step is required for perfection (e.g., purchase-money security interests in consumer goods other than automobiles). This automatic perfection also extends to a transfer of a health-care-insurance receivable *to* a health-care provider. Those transfers normally will be made by natural persons who receive health-care services; there is little value in requiring filing for perfection in that context. Automatic perfection also applies to security interests created by sales of payment intangibles and promissory notes. Section 9-308 provides that a perfected security interest in collateral supported by a "supporting obligation" (such as an account supported by a guaranty) also is a perfected security interest in the supporting obligation, and that a perfected security interest in an obligation secured by a security interest or lien on property (e.g., a real-property mortgage) also is a perfected security interest in the security interest or lien.

e. **Priority; Special Rules for Banks and Deposit Accounts.** The rules governing priority of security interests and agricultural liens are found in Part 3, Subpart 3 (Sections 9-317 through 9-342). This Article includes several new priority rules and some special rules relating to banks and deposit accounts (Sections 9-340 through 9-342).

*Purchase-money security interests: General; consumer-goods transactions; inventory.* Section 9-103 substantially rewrites the definition of purchase-money security interest (PMSI) (although the term is not formally "defined"). The substantive changes, however, apply only to non-consumer-goods transactions. (Consumer transactions and consumer-goods transactions are discussed below in Comment 4.j.) For non-consumer-goods transactions, Section 9-103 makes clear that a security interest in collateral may be (to some extent) both a PMSI as well as a non-PMSI, in accord with the "dual status" rule applied by some courts under former Article 9 (thereby rejecting the "transformation" rule). The definition provides an even broader conception of a PMSI in inventory, yielding a result that accords with private agreements entered into in response to the uncertainty under former Article 9. It also treats consignments as purchase-money security interests in inventory. Section 9-324 revises the PMSI priority rules, but for the most part without material change in substance. Section 9-324 also clarifies the priority rules for competing PMSIs in the same collateral.

*Purchase-money security interests in livestock; agricultural liens.* Section 9-324 provides a special PMSI priority, similar to the inventory PMSI priority rule, for livestock. Section 9-322 (which contains the baseline first-to-file-or-perfect priority rule) also recognizes special non-Article 9 priority rules for agricultural liens, which can override the baseline first-in-time rule.

*Purchase-money security interests in software.* Section 9-324 contains a new priority rule for a software purchase-money security interest.

*Investment property.* The priority rules for investment property are substantially similar to the priority rules found in former Section 9-115, which was added in conjunction with the 1994 revisions to UCC Article 8. Under Section 9-328, if a secured party has control of investment property (Sections 8-106, 9-106), its security interest is senior to a security interest perfected in another manner (e.g., by filing). Also under Section 9-328, security interests perfected by control generally rank according to the time that control is obtained or, in the case of a security entitlement or a commodity contract carried in a commodity account, the time when the control arrangement is entered into. This is a change from former Section 9-115, under which the security interests ranked equally. However, as between a securities intermediary's security interest in a security entitlement that

it maintains for the debtor and a security interest held by another secured party, the securities intermediary's security interest is senior.

*Deposit accounts.* This Article's priority rules applicable to deposit accounts are found in Section 9-327. They are patterned on and are similar to those for investment property in former Section 9-115 and Section 9-328 of this Article. Under Section 9-327, if a secured party has control of a deposit account, its security interest is senior to a security interest perfected in another manner (i.e., as cash proceeds). Also under Section 9-327, security interests perfected by control rank according to the time that control is obtained, but as between a depositary bank's security interest and one held by another secured party, the depositary bank's security interest is senior. A corresponding rule in Section 9-340 makes a depositary bank's right of set-off generally senior to a security interest held by another secured party. However, if the other secured party becomes the depositary bank's customer with respect to the deposit account, then its security interest is senior to the depositary bank's security interest and right of set-off. Sections 9-327, 9-340.

*Letter-of-credit rights.* The priority rules for security interests in letter-of-credit rights are found in Section 9-329. They are somewhat analogous to those for deposit accounts. A security interest perfected by control has priority over one perfected in another manner (i.e., as a supporting obligation for the collateral in which a security interest is perfected). Security interests in a letter-of-credit right perfected by control rank according to the time that control is obtained. However, the rights of a transferee beneficiary or a nominated person are independent and superior to the extent provided in Section 5-114. See Section 9-109(c)(4).

*Chattel paper and instruments.* Section 9-330 is the successor to former Section 9-308. As under former Section 9-308, differing priority rules apply to purchasers of chattel paper who give new value and take possession (or, in the case of electronic chattel paper, obtain control) of the collateral depending on whether a conflicting security interest in the collateral is claimed merely as proceeds. The principal change relates to the role of knowledge and the effect of an indication of a previous assignment of the collateral. Section 9-330 also affords priority to purchasers of instruments who take possession in good faith and without knowledge that the purchase violates the rights of the competing secured party. In addition, to qualify for priority, purchasers of chattel paper, but not of instruments, must purchase in the ordinary course of business.

*Proceeds.* Section 9-322 contains new priority rules that clarify when a special priority of a security interest in collateral continues or does not continue with respect to proceeds of the collateral. Other refinements to the priority rules for proceeds are included in Sections 9-324 (purchase-money security interest priority) and 9-330 (priority of certain purchasers of chattel paper and instruments).

*Miscellaneous priority provisions.* This Article also includes (i) clarifications of selected good-faith-purchase and similar issues (Sections 9-317, 9-331); (ii) new priority rules to deal with the "double debtor" problem arising when a debtor creates a security interest in collateral acquired by the debtor subject to a security interest created by another person (Section 9-325); (iii) new priority rules to deal with the problems created when a change in corporate structure or the like results in a new entity that has become bound by the original debtor's after-acquired property agreement (Section 9-326); (iv) a provision enabling most transferees of funds from a deposit account or money to take free of a security interest (Section 9-332); (v) substantially rewritten and refined priority rules dealing with accessions and commingled goods (Sections 9-335, 9-336); (vi) revised priority rules for security interests in goods covered by a certificate of title (Section 9-337); and (vii) provisions designed to ensure that security interests in deposit accounts will not extend to most transferees of funds on deposit or payees from deposit accounts and will not otherwise "clog" the payments system (Sections 9-341, 9-342).

*Model provisions relating to production-money security interests.* Appendix II to this Article contains model definitions and priority rules relating to "production-money security interests" held by secured parties who give new value used in the production of crops. Because no consensus emerged on the wisdom of these provisions during the drafting process, the sponsors make no recommendation on whether these model provisions should be enacted.

f. **Proceeds.** Section 9-102 contains an expanded definition of "proceeds" of collateral which includes additional rights and property that arise out of collateral, such as distributions on account of collateral and claims arising out of the loss or nonconformity of, defects in, or damage to collateral. The term also includes collections on account of "supporting obligations," such as guarantees.

g. **Part 4: Additional Provisions Relating to Third-Party Rights.** New Part 4 contains several provisions relating to the relationships between certain third parties and the parties to secured transactions. It contains new Sections 9-401 (replacing former Section 9-311) (alienability of debtor's rights), 9-402 (replacing former Section 9-317) (secured party not obligated on debtor's contracts), 9-403 (replacing former Section 9-206) (agreement not to assert defenses against assignee), 9-404, 9-405, and 9-406 (replacing former Section 9-318) (rights acquired by assignee, modification of assigned contract, discharge of account debtor, restrictions on assignment of account, chattel paper, promissory note, or payment intangible ineffective), 9-407 (replacing some provisions of former Section 2A-303) (restrictions on creation or enforcement of security interest in leasehold interest or lessor's residual interest ineffective). It also contains new Sections 9-408 (restrictions on assignment of promissory notes, health-care-insurance receivables ineffective, and certain general intangibles ineffective) and 9-409 (restrictions on assignment of letter-of-credit rights ineffective), which are discussed above.

h. **Filing.** Part 5 (formerly Part 4) of Article 9 has been substantially rewritten to simplify the statutory text and to deal with numerous problems of interpretation and implementation that have arisen over the years.

*Medium-neutrality.* This Article is "medium-neutral"; that is, it makes clear that parties may file and otherwise communicate with a filing office by means of records communicated and stored in media other than on paper.

*Identity of person who files a record; authorization.* Part 5 is largely indifferent as to the person who effects a filing. Instead, it addresses whose authorization is necessary for a person to file a record with a filing office. The filing scheme does not contemplate that the identity of a "filer" will be a part of the searchable records. This approach is consistent with, and a necessary aspect of, eliminating signatures or other evidence of authorization from the system (except to the extent that filing offices may choose to employ authentication procedures in connection with electronic communications). As long as the appropriate person authorizes the filing, or, in the case of a termination statement, the debtor is entitled to the termination, it is largely insignificant whether the secured party or another person files any given record.

Section 9-509 collects in one place most of the rules that determine when a record may be filed. In general, the debtor's authorization is required for the filing of an initial financing statement or an amendment that adds collateral. With one further exception, a secured party of record's authorization is required for the filing of other amendments. The exception arises if a secured party has failed to provide a termination statement that is required because there is no outstanding secured obligation or commitment to give value. In that situation, a debtor is authorized to file a termination statement indicating that it has been filed by the debtor.

*Financing statement formal requisites.* The formal requisites for a financing statement are set out in Section 9-502. A financing statement must provide the name of the debtor and the secured party and an indication of the collateral that it covers. Sections 9-503 and 9-506 address the sufficiency of a name provided on a financing statement and clarify when a debtor's name is correct and when an incorrect name is insufficient. Section 9-504 addresses the indication of collateral covered. Under Section 9-504, a super-generic description (e.g.,"all assets" or "all personal property") in a financing statement is a sufficient indication of the collateral. (Note, however, that a super-generic description is inadequate for purposes of a security agreement. See Sections 9-108, 9-203.) To facilitate electronic filing, this Article does not require that the debtor's signature or other authorization appear on a financing statement. Instead, it prohibits the filing of unauthorized financing statements and imposes liability upon those who violate the prohibition. See Sections 9-509, 9-626.

*Filing-office operations.* Part 5 contains several provisions governing filing operations. First, it prohibits the filing office from rejecting an initial financing statement or other record for a reason other than one of the few that are specified. See Sections

9-520, 9-516. Second, the filing office is obliged to link all subsequent records (e.g., assignments, continuation statements, etc.) to the initial financing statement to which they relate. See Section 9-519. Third, the filing office may delete a financing statement and related records from the files no earlier than one year after lapse (lapse normally is five years after the filing date), and then only if a continuation statement has not been filed. See Sections 9-515, 9-519, 9-522. Thus, a financing statement and related records would be discovered by a search of the files even after the filing of a termination statement. This approach helps eliminate filing-office discretion and also eases problems associated with multiple secured parties and multiple partial assignments. Fourth, Part 5 mandates performance standards for filing offices. See Sections 9-519, 9-520, 9-523. Fifth, it provides for the promulgation of filing-office rules to deal with details best left out of the statute and requires the filing office to submit periodic reports. See Sections 9-526, 9-527.

*Defaulting or missing secured parties and fraudulent filings.* In some areas of the country, serious problems have arisen from fraudulent financing statements that are filed against public officials and other persons. This Article addresses the fraud problem by providing the opportunity for a debtor to file a termination statement when a secured party wrongfully refuses or fails to provide a termination statement. See Section 9-509. This opportunity also addresses the problem of secured parties that simply disappear through mergers or liquidations. In addition, Section 9-518 affords a statutory method by which a debtor who believes that a filed record is inaccurate or was wrongfully filed may indicate that fact in the files, albeit without affecting the efficacy, if any, of the challenged record.

*Extended period of effectiveness for certain financing statements.* Section 9-515 contains an exception to the usual rule that financing statements are effective for five years unless a continuation statement is filed to continue the effectiveness for another five years. Under that section, an initial financing statement filed in connection with a "public-finance transaction" or a "manufactured-home transaction" (terms defined in Section 9-102) is effective for 30 years.

*National form of financing statement and related forms.* Section 9-521 provides for uniform, national written forms of financing statements and related written records that must be accepted by a filing office that accepts written records.

i. **Default and Enforcement.** Part 6 of Article 9 extensively revises former Part 5. Provisions relating to enforcement of consumer-goods transactions and consumer transactions are discussed in Comment 4.j.

*Debtor, secondary obligor; waiver.* Section 9-602 clarifies the identity of persons who have rights and persons to whom a secured party owes specified duties under Part 6. Under that section, the rights and duties are enjoyed by and run to the "debtor," defined in Section 9-102 to mean any person with a non-lien property interest in collateral, and to any "obligor." However, with one exception (Section 9-616, as it relates to a consumer obligor), the rights and duties concerned affect non-debtor obligors only if they are "secondary obligors." "Secondary obligor" is defined in Section 9-102 to include one who is secondarily obligated on the secured obligation, e.g., a guarantor, or one who has a right of recourse against the debtor or another obligor with respect to an obligation secured by collateral. However, under Section 9-628, the secured party is relieved from any duty or liability to any person unless the secured party knows that the person is a debtor or obligor. Resolving an issue on which courts disagreed under former Article 9, this Article generally prohibits waiver by a secondary obligor of its rights and a secured party's duties under Part 6. See Section 9-602. However, Section 9-624 permits a secondary obligor or debtor to waive the right to notification of disposition of collateral and, in a non-consumer transaction, the right to redeem collateral, if the secondary obligor or debtor agrees to do so after default.

*Rights of collection and enforcement of collateral.* Section 9-607 explains in greater detail than former 9-502 the rights of a secured party who seeks to collect or enforce collateral, including accounts, chattel paper, and payment intangibles. It also sets forth the enforcement rights of a depositary bank holding a security interest in a deposit account maintained with the depositary bank. Section 9-607 relates solely to the rights of a secured party vis-a-vis a debtor with respect to collections and enforcement. It does not affect the rights or duties of third parties, such as account debtors on collateral, which are addressed elsewhere (e.g., Section 9-406). Section 9-608 clarifies the manner in which proceeds of collection or enforcement are to be applied.

*Disposition of collateral: Warranties of title.* Section 9-610 imposes on a secured party who disposes of collateral the warranties of title, quiet possession, and the like that are otherwise applicable under other law. It also provides rules for the exclusion or modification of those warranties.

*Disposition of collateral: Notification, application of proceeds, surplus and deficiency, other effects.* Section 9-611 requires a secured party to give notification of a disposition of collateral to other secured parties and lienholders who have filed financing statements against the debtor covering the collateral. (That duty was eliminated by the 1972 revisions to Article 9.) However, that section relieves the secured party from that duty when the secured party undertakes a search of the records and a report of the results is unreasonably delayed. Section 9-613, which applies only to non-consumer transactions, specifies the contents of a sufficient notification of disposition and provides that a notification sent 10 days or more before the earliest time for disposition is sent within a reasonable time. Section 9-615 addresses the application of proceeds of disposition, the entitlement of a debtor to any surplus, and the liability of an obligor for any deficiency. Section 9-619 clarifies the effects of a disposition by a secured party, including the rights of transferees of the collateral.

*Rights and duties of secondary obligor.* Section 9-618 provides that a secondary obligor obtains the rights and assumes the duties of a secured party if the secondary obligor receives an assignment of a secured obligation, agrees to assume the secured party's rights and duties upon a transfer to it of collateral, or becomes subrogated to the rights of the secured party with respect to the collateral. The assumption, transfer, or subrogation is not a disposition of collateral under Section 9-610, but it does relieve the former secured party of further duties. Former Section 9-504(5) did not address whether a secured party was relieved of its duties in this situation.

*Transfer of record or legal title.* Section 9-619 contains a new provision making clear that a transfer of record or legal title to a secured party is not of itself a disposition under Part 6. This rule applies regardless of the circumstances under which the transfer of title occurs.

*Strict foreclosure*. Section 9-620, unlike former Section 9-505, permits a secured party to accept collateral in partial satisfaction, as well as full satisfaction, of the obligations secured. This right of strict foreclosure extends to intangible as well as tangible property. Section 9-622 clarifies the effects of an acceptance of collateral on the rights of junior claimants. It rejects the approach taken by some courts-deeming a secured party to have constructively retained collateral in satisfaction of the secured obligations-in the case of a secured party's unreasonable delay in the disposition of collateral. Instead, unreasonable delay is relevant when determining whether a disposition under Section 9-610 is commercially reasonable.

*Effect of noncompliance: "Rebuttable presumption" test.* Section 9-626 adopts the "rebuttable presumption" test for the failure of a secured party to proceed in accordance with certain provisions of Part 6. (As discussed in Comment 4.j., the test does not necessarily apply to consumer transactions.) Under this approach, the deficiency claim of a noncomplying secured party is calculated by crediting the obligor with the greater of the actual net proceeds of a disposition and the amount of net proceeds that would have been realized if the disposition had been conducted in accordance with Part 6 (e.g., in a commercially reasonable manner). For non-consumer transactions, Section 9-626 rejects the "absolute bar" test that some courts have imposed; that approach bars a noncomplying secured party from recovering any deficiency, regardless of the loss (if any) the debtor suffered as a consequence of the noncompliance.

*"Low-price" dispositions: Calculation of deficiency and surplus.* Section 9-615(f) addresses the problem of procedurally regular dispositions that fetch a low price. Subsection (f) provides a special method for calculating a deficiency if the proceeds of a disposition of collateral to a secured party, a person related to the secured party, or a secondary obligor are "significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought." ("Person related to" is defined in Section 9-102.) In these situations there is reason to suspect that there may be inadequate incentives to obtain a better price. Consequently, instead of calculating a deficiency (or surplus) based on the actual net proceeds, the deficiency (or surplus) would be calculated based on the proceeds that would have been received in a disposition to person other than the secured party, a person related to the secured party, or a secondary obligor.

j. **Consumer Goods, Consumer-Goods Transactions, and Consumer Transactions.** This Article (including the accompanying conforming revisions (see Appendix I)) includes several special rules for "consumer goods," "consumer transactions," and "consumer-goods transactions." Each term is defined in Section 9-102.

(i) Revised Sections 2-502 and 2-716 provide a buyer of consumer goods with enhanced rights to possession of the goods, thereby accelerating the opportunity to achieve "buyer in ordinary course of business" status under Section 1-201.

(ii) Section 9-103(e) (allocation of payments for determining extent of purchase-money status), (f) (purchase-money status not affected by cross-collateralization, refinancing, restructuring, or the like), and (g) (secured party has burden of establishing extent of purchase-money status) do not apply to consumer-goods transactions. Sections 9-103 also provides that the limitation of those provisions to transactions other than consumer-goods transactions leaves to the courts the proper rules for consumer-goods transactions and prohibits the courts from drawing inferences from that limitation.

(iii) Section 9-108 provides that in a consumer transaction a description of consumer goods, a security entitlement, securities account, or commodity account "only by [UCC-defined] type of collateral" is not a sufficient collateral description in a security agreement.

(iv) Sections 9-403 and 9-404 make effective the Federal Trade Commission's anti-holder-in-due-course rule (when applicable), 16 C.F.R. Part 433, even in the absence of the required legend.

(v) The 10-day safe-harbor for notification of a disposition provided by Section 9-612 does not apply in a consumer transaction.

(vi) Section 9-613 (contents and form of notice of disposition) does not apply to a consumer-goods transaction.

(vii) Section 9-614 contains special requirements for the contents of a notification of disposition and a safe-harbor, "plain English" form of notification, for consumer-goods transactions.

(viii) Section 9-616 requires a secured party in a consumer-goods transaction to provide a debtor with a notification of how it calculated a deficiency at the time it first undertakes to collect a deficiency.

(ix) Section 9-620 prohibits partial strict foreclosure with respect to consumer goods collateral and, unless the debtor agrees to waive the requirement in an authenticated record after default, in certain cases requires the secured party to dispose of consumer goods collateral which has been repossessed.

(x) Section 9-626 ("rebuttable presumption" rule) does not apply to a consumer transaction. Section 9-626 also provides that its limitation to transactions other than consumer transactions leaves to the courts the proper rules for consumer transactions and prohibits the courts from drawing inferences from that limitation.

k. **Good Faith.** Section 9-102 contains a new definition of "good faith" that includes not only "honesty in fact" but also "the observance of reasonable commercial standards of fair dealing." The definition is similar to the ones adopted in connection with other, recently completed revisions of the UCC.

l. **Transition Provisions.** Part 7 (Sections 9-701 through 9-709) contains transition provisions. Transition from former Article 9 to this Article will be particularly challenging in view of its expanded scope, its modification of choice-of-law rules for perfection and priority, and its expansion of the methods of perfection.

m. **Conforming and Related Amendments to Other UCC Articles.** Appendix I contains several proposed revisions to the provisions and Comments of other UCC articles. For the most part the revisions are explained in the Comments to the proposed revisions. Cross-references in other UCC articles to sections of Article 9 also have been revised.

*Article 1.* Revised Section 1-201 contains revisions to the definitions of "buyer in ordinary course of business," "purchaser," and "security interest."

*Articles 2 and 2A.* Sections 2-210, 2-326, 2-502, 2-716, 2A-303, and 2A-307 have been revised to address the intersection between Articles 2 and 2A and Article 9.

*Article 5.* New Section 5-118 is patterned on Section 4-210. It provides for a security interest in documents presented under a letter of credit in favor of the issuer and a nominated person on the letter of credit.

*Article 8.* Revisions to Section 8-106, which deals with "control" of securities and security entitlements, conform it to Section 8-302, which deals with "delivery." Revisions to Section 8-110, which deals with a "securities intermediary's jurisdiction," conform it to the revised treatment of a "commodity intermediary's jurisdiction" in Section 9-305. Sections 8-301 and 8-302 have been revised for clarification. Section 8-510 has been revised to conform it to the revised priority rules of Section 9-328. Several Comments in Article 8 also have been revised.

Notes of Decisions (1)

V. T. C. A., Bus. & C. § 9.101, TX BUS & COM § 9.101
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business and Commerce Code (Refs & Annos)
      Title 1. Uniform Commercial Code (Refs & Annos)
        Chapter 9. Secured Transactions (Refs & Annos)
          Subchapter F. Default

V.T.C.A., Bus. & C. § 9.625

§ 9.625. Remedies for Secured Party's Failure to Comply with Chapter

Effective: July 1, 2001
Currentness

(a) If it is established that a secured party is not proceeding in accordance with this chapter, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.

(b) Subject to Subsections (c), (d), and (f), a person is liable for damages in the amount of any loss caused by a failure to comply with this chapter. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing.

(c) Except as otherwise provided in Section 9.628:

   (1) a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral may recover damages under Subsection (b) for its loss; and

   (2) if the collateral is consumer goods, a person that was a debtor or a secondary obligor at the time a secured party failed to comply with this subchapter may recover for that failure in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation or the time price differential plus 10 percent of the cash price.

(d) A debtor whose deficiency is eliminated under Section 9.626 may recover damages for the loss of any surplus. However, a debtor or secondary obligor whose deficiency is eliminated or reduced under Section 9.626 may not otherwise recover under Subsection (b) for noncompliance with the provisions of this subchapter relating to collection, enforcement, disposition, or acceptance.

(e) In addition to any damages recoverable under Subsection (b), the debtor, consumer obligor, or person named as a debtor in a filed record, as applicable, may recover $500 in each case from a person that:

   (1) fails to comply with Section 9.208;

   (2) fails to comply with Section 9.209;

(3) files a record that the person is not entitled to file under Section 9.509(a);

(4) fails to cause the secured party of record to file or send a termination statement as required by Section 9.513(a) or (c);

(5) fails to comply with Section 9.616(b)(1) and whose failure is part of a pattern, or consistent with a practice, of noncompliance; or

(6) fails to comply with Section 9.616(b)(2).

(f) A debtor or consumer obligor may recover damages under Subsection (b) and, in addition, $500 in each case from a person that, without reasonable cause, fails to comply with a request under Section 9.210. A recipient of a request under Section 9.210 that never claimed an interest in the collateral or obligations that are the subject of a request under that section has a reasonable excuse for failure to comply with the request within the meaning of this subsection.

(g) If a secured party fails to comply with a request regarding a list of collateral or a statement of account under Section 9.210, the secured party may claim a security interest only as shown in the list or statement included in the request as against a person that is reasonably misled by the failure.

**Credits**

Added by Acts 1999, 76th Leg., ch. 414, § 1.01, eff. July 1, 2001. Amended by Acts 2001, 77th Leg., ch. 705, § 22, eff. June 13, 2001.

**Editors' Notes**

### UNIFORM COMMERCIAL CODE COMMENT

### 2011 Main Volume

1. **Source.** Former Section 9-507.

2. **Remedies for Noncompliance; Scope.** Subsections (a) and (b) provide the basic remedies afforded to those aggrieved by a secured party's failure to comply with this Article. Like all provisions that create liability, they are subject to Section 9-628, which should be read in conjunction with Section 9-605. The principal limitations under this Part on a secured party's right to enforce its security interest against collateral are the requirements that it proceed in good faith (Section 1-203), in a commercially reasonable manner (Sections 9-607 and 9-610), and, in most cases, with reasonable notification (Sections 9-611 through 9-614). Following former Section 9-507, under subsection (a) an aggrieved person may seek injunctive relief, and under subsection (b) the person may recover damages for losses caused by noncompliance. Unlike former Section 9-507, however, subsections (a) and (b) are not limited to noncompliance with provisions of this Part of Article 9. Rather, they apply to noncompliance with any provision of this Article. The change makes this section applicable to noncompliance with Sections 9-207 (duties of secured party in possession of collateral), 9-208 (duties of secured party having control over deposit account), 9-209 (duties of secured party if account debtor has been notified of an assignment), 9-210 (duty to comply with request for accounting, etc.), 9-509(a) (duty to refrain from filing unauthorized financing statement), and 9-513(a) or (c) (duty to provide termination statement). Subsection (a) also modifies the first sentence of former Section 9-507(1) by adding the references to "collection"

and "enforcement." Subsection (c)(2), which gives a minimum damage recovery in consumer-goods transactions, applies only to noncompliance with the provisions of this Part.

3. **Damages for Noncompliance with This Article.** Subsection (b) sets forth the basic remedy for failure to comply with the requirements of this Article: a damage recovery in the amount of loss caused by the noncompliance. Subsection (c) identifies who may recover under subsection (b). It affords a remedy to any aggrieved person who is a debtor or obligor. However, a principal obligor who is not a debtor may recover damages only for noncompliance with Section 9-616, inasmuch as none of the other rights and duties in this Article run in favor of such a principal obligor. Such a principal obligor could not suffer any loss or damage on account of noncompliance with rights or duties of which it is not a beneficiary. Subsection (c) also affords a remedy to an aggrieved person who holds a competing security interest or other lien, regardless of whether the aggrieved person is entitled to notification under Part 6. The remedy is available even to holders of senior security interests and other liens. The exercise of this remedy is subject to the normal rules of pleading and proof. A person who has delegated the duties of a secured party but who remains obligated to perform them is liable under this subsection. The last sentence of subsection (d) eliminates the possibility of double recovery or other over-compensation arising out of a reduction or elimination of a deficiency under Section 9-626, based on noncompliance with the provisions of this Part relating to collection, enforcement, disposition, or acceptance. Assuming no double recovery, a debtor whose deficiency is eliminated under Section 9-626 may pursue a claim for a surplus. Because Section 9-626 does not apply to consumer transactions, the statute is silent as to whether a double recovery or other over-compensation is possible in a consumer transaction.

Damages for violation of the requirements of this Article, including Section 9-609, are those reasonably calculated to put an eligible claimant in the position that it would have occupied had no violation occurred. See Section 1-106. Subsection (b) supports the recovery of actual damages for committing a breach of the peace in violation of Section 9-609, and principles of tort law supplement this subsection. See Section 1-103. However, to the extent that damages in tort compensate the debtor for the same loss dealt with by this Article, the debtor should be entitled to only one recovery.

4. **Minimum Damages in Consumer-Goods Transactions.** Subsection (c)(2) provides a minimum, statutory, damage recovery for a debtor and secondary obligor in a consumer-goods transaction. It is patterned on former Section 9-507(1) and is designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted. Subsection (c)(2) leaves the treatment of statutory damages as it was under former Article 9. A secured party is not liable for statutory damages under this subsection more than once with respect to any one secured obligation (see Section 9-628(e)), nor is a secured party liable under this subsection for failure to comply with Section 9-616 (see Section 9-628(d)).

Following former Section 9-507(1), this Article does not include a definition or explanation of the terms "credit service charge," "principal amount," "time-price differential," or "cash price," as used in subsection (c)(2). It leaves their construction and application to the court, taking into account the subsection's purpose of providing a minimum recovery in consumer-goods transactions.

5. **Supplemental Damages.** Subsections (e) and (f) provide damages that supplement the recovery, if any, under subsection (b). Subsection (e) imposes an additional $500 liability upon a person who fails to comply with the provisions specified in that subsection, and subsection (f) imposes like damages on a person who, without reasonable excuse, fails to comply with a request for an accounting or a request regarding a list of collateral or statement of account under Section 9-210. However, under subsection (f), a person has a reasonable excuse for the failure if the person never claimed an interest in the collateral or obligations that were the subject of the request.

6. **Estoppel.** Subsection (g) limits the extent to which a secured party who fails to comply with a request regarding a list of collateral or statement of account may claim a security interest.

Notes of Decisions (37)

V. T. C. A., Bus. & C. § 9.625, TX BUS & COM § 9.625
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.